UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
ZACHARY GIAMBALVO, JOHN MOUGIOS,
SHANE MASHKOW, KEVIN MCLAUGHLIN,
MICHAEL MCGREGOR, FRANK MELLONI,
and RENAISSANCE FIREARMS INSTRUCTION,
INC., and all similarly situated individuals,

                          Plaintiffs,

                                                          **Case No.: 2:22-cv-04778**

          - against -
                                                          (Brown, J.)(Tiscione, M.J.)

SUFFOLK COUNTY, New York, Police Commissioner
RODNEY HARRISON, in his Official Capacity, MICHAEL
KOMOROWSKI, Individually, ERIC BOWEN, Individually,
WILLIAM SCRIMA, Individually, WILLIAM WALSH,
Individually, THOMAS CARPENTER, Individually, JOHN
DOES 1-5, Individually and JANE DOES 1-5, Individually,
Acting Superintendent of the New York State Police
STEVEN NIGRELLI, in his Official Capacity,

                          Defendants.
-----------------------------------------------------------------------X

## DEFENDANT SUPERINTENDENT NIGRELLI'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General of the
    State of New York
300 Motor Parkway, Suite 230
Hauppauge, New York   11788
(631) 231-2424

PATRICIA M. HINGERTON
OF COUNSEL

TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………...………………......…iii

PRELIMINARY STATEMENT……….......................................................................................1

BACKGROUND....................................................................................................................2

     A.  *New York State Rifle & Pistol Association v. Bruen* …………………………..……2

     B.  The CCIA ……………………………………………………………………..…3

     C.  The Instant Application ..…………………………………………………………...4

STANDARD OF REVIEW ……………………………….…………………….…………..6

ARGUMENT

I.    PLAINTIFFS LACK STANDING TO CHALLENGE THE
      CONSTITUTIONALITY OF THE CCIA …………..……………………………………7

     A.  Plaintiffs Have Not Suffered an "Injury-in-Fact" Related to the CCIA Licensing
        Provisions …………………………………………….…………………………7

     B.  Plaintiffs Have Not Suffered an Injury-in-Fact Related
        to Penal Law §400.00(15) ….………………… …………………………………...9

II.   PLAINTIFFS HAVE NOT MADE A STRONG SHOWING OF
      IMMINENT AND IRREPARABLE HARM FROM THE CHALLENGED
      CCIA PROVISIONS …………………………………………………....…………11

III.  PLAINTIFFS HAVE NOT SHOWN A CLEAR LIKELIHOOD OF SUCCESS
      ON THE MERITS OF THEIR SECOND AMENDMENT
      CHALLENGES TO THE CCIA …………………………………….……………11

   A.  Plaintiffs Fail To Carry Their Burden On The First Part Of The *Bruen* Test……….…..12

   B.  The Nation's Historical Tradition of Firearms Regulation Supports
      Provisions Aimed at Ensuring That Only Law-Abiding and Responsible
      Persons Are Armed …………………………………………………….……………14

   C.  The Good Moral Character Requirement is Constitutional …………………………..18

   D.  The Licensing Requirements Are Constitutional …………………………..………….20

i

  a. In-Person Interview ……………………………………...…………...…………20

  b. Character References ………………...……………………………...…………21

  c. Cohabitants …………………………………………………….………...…21

  d. Training Requirement …………………………………………...….…22

  e. Social Media …………………………...…………………………………24

  f. Allowing Licensing Officers to Request Other Information …………….....26

 E. Plaintiffs Cannot Succeed on a Facial Challenge to the Requirement
  That License Applications Be Ruled On Within Six Months of the
  Date of Presentment …………………………………………………….….…...27

 F. Applying A Criminal Penalty to Persons Who Carry Outside of License
  Restrictions is Constitutional ………………………………………….….……...29

IV. THE EQUITIES AND THE PUBLIC INTEREST FAVOR ALLOWING
  ENFORCEMENT OF THE CCIA.…………………………………….…………….30

CONCLUSION.................................................................................................................30

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Able v. United States*, 44 F.3d 128 (2d Cir. 1995)………………………………………………7

*Adam v. Barr*, 792 F. App'x 20 (2d Cir. 2019)………………………………………………...9, 10

*Bach v. Pataki*, 408 F.3d 75 (2d Cir. 2005)……………………………………………………..8-9

*Baird v. Bonta*, No. 19-cv-617, 2022 U.S. Dist. Lexis 221461 (E.D. Cal. Dec. 8, 2022)………...…6

*Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985)………………………………………11

*Corbett v. Hochul*, No. 22 Civ. 5867 (S.D.N.Y. Nov. 29, 2022)……………………………..23, 24

*Dickerson v. Napolitano*, 604 F.3d 732 (2d Cir. 2010)………………………………………...11

*District of Columbia v. Heller*, 554 U.S. 570 (2008)……………………………………12, 20, 22, 29

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014)…………………………………………………..25-26

*Does v. Suffolk Cnty.*, 2022 U.S. App. Lexis 19094 (2d Cir. July 12, 2022)………………………10

*Dwyer v. Farrell*, 193 Conn. 7 (1984)………………………………………………………….19

*Frey v. Bruen*, No. 21 Civ. 5334, 2022 U.S. Dist. Lexis 31053
(S.D.N.Y. Feb. 22, 2022) …………………………………………………………………….4, 9, 10

*Gazzola v. Hochul*, No. 22 Civ. 1134, 2022 U.S. Dist. Lexis 220168
(N.D.N.Y. Dec. 7, 2022)……………………………………………………………………….13

*INS v. Miranda*, 459 U.S. 14 (1982)…………………………………………………………...28

*Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324 (1977)……………………………………..8

*Jackson-Bey v. Hanslmaier*, 115 F.3d 1091 (2d Cir. 1997)………………………………….....9

*Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178 (2d Cir. 2017)………………………27

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)………………………………………………...19

*Konigsberg v. State Bar of Cal.*, 353 U.S. 252 (1957)………………………………………….18

*Libertarian Party of Erie Cnty. v. Cuomo,* 970 F.3d 106 (2d Cir. 2020)……………8-9, 18, 25-26

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)…………………………………………..7

*Maryland v. King*, 567 U.S. 1301 (2012)……………………………………………………...30

*Mastrovincenzo v. City of New York*, 435 F.3d 78 (2d Cir. 2006)……………………………...26

*McDonald v. Chicago*, 561 U.S. 742 (2010)…………………………………………………...9

*New York State Rifle & Pistol Association v. Bruen,* 142 S. Ct. 2111
(2022)………………………………………………………2-3, 8, 12, 14, 18-20, 22, 24, 28, 29

*Nken v. Holder*, 556 U.S. 418 (2009)…………………………………………………………6

*Or. Firearms Fed., Inc. v. Brown*, No. 22-cv-1815, 2022 U.S. Dist. Lexis 219391
(D. Or. Dec. 6, 2022)……………………………………………………………………13

*Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017)………………………………………14

*People ex. rel. Schneiderman v. Actavis PLLC*, 787 F.3d 638 (2d Cir. 2015)………………………7

*Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1999)……………………………11

*Sibley v. Watches*, 501 F. Supp. 3d 210 (W.D.N.Y. 2020)…………………………………………10

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)……………………………………………………7

*Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017)………………………………7

*U.S. v. Yancey*, 621 F.3d 681 (7th Cir. 2010)……………………………………………………18

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012)……………………………………15

*United States v. Decastro*, 682 F. 3d 160 (2d Cir. 2012)…………………………………………8

*United States v. Gonzalez*, No. 22-CV-54, 2022 U.S. Dist. Lexis 224710
(D. Utah Dec. 12, 2022)……………………………………………………………………13

*United States v. Miller*, 307 U.S. 174 (1939)……………………………………………………23

*United States v. Reyna*, No. 21-CR-41, 2022 U.S. Dist. Lexis 225896
(N.D. Ind. Dec. 15, 2022)………………………………………………………………12-14

*United States v. Salerno*, 481 U.S. 739 (1987)…………………………………………………11, 25

*United States v. Tilotta*, No. 19-cr-4768, 2022 U.S. Dist. Lexis 156715
(S.D. Cal. Aug. 30, 2022)……………………………………………………………12-14, 21-22

*We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 (2d Cir. 2022)……………………………12

*Williams v. King*, 56 F. Supp. 3d 308 (S.D.N.Y. 2014)…………………………………………9

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008)………………………………………………………6, 30

*Young Advocs. for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215 (E.D.N.Y. 2019)…………………10

**Statutes**

11 Del. Code Ann. § 1441(a)(3)………………………………………………………………22

13 Alaska Admin. Code § 30.070(a)(1)(A)…………………………………………………………23

2022 N.Y. Laws 371 § 26(a)……………………………………………………......8

21 Okla. Stat. Ann. § 1290.12(A)(2)……………………………………………...22

25 Maine Stat. § 2003(1)(E)(5)………………………………………………….....22

28 U.S.C. § 476……………………………………………………………………29

42 U.S.C. § 1983…………………………………………………………………….1

430 Ill. Stat. § 66/25(6)…………………………………………………………….22

430 Ill. Comp. Stat. 66/75(b)……………………………………………………….23

Ala. Stat. § 13A-11-75(d)(2)……………………………………………………...27

Alaska Stat. § 18.65.705(6)………………………………………………………..22

Ariz. Stat. § 13-3112(E)(6)………………………………………………………..22

Ark. Stat. § 5-73-309(13)………………………………………………………….22

Cal. Penal Code § 26165(a)(3)…………………………………………………….23

Colo. Stat. § 18-12-203(1)(h)(VI)………………………………………………...22

Conn. Gen. Stat. § 29-28(b)…………………………………………………...19, 22

Fla. Stat. § 190.06(2)(h)(2)-(4)……………………………………………………22

Ga. Code Ann. § 16-11-129(d)(4)………………………………………………...19

Idaho Stat. § 18-3302K(4)(c)……………………………………………………...22

Ind. Code § 35-47-2-3(g)………………………………………………………….19

Iowa Stat. § 724.9…………………………………………………………………22

Kan. Stat. 75-7c04(b)(1)…………………………………………………………..22

Ky. Stat. § 237.110(4)(i)…………………………………………………………..22

La. Rev. Stat. § 1379.3(D)………………………………………………………...22

Mich. Stat. § 28.425j……………………………………………………………...22

Minn. Stat. § 624.714……………………………………………………………..22

Mo. Stat. 571.101(2)(10)………………………………………………………….22

Mont. Stat. § 45-8-321(3)…………………………………………………………22

Nev. Rev. Stat. § 202.3657(3)(c)…………………………………………………22

N.M. Stat. Ann. § 29-19-4(A)(10)………………………………………………..22

N.M. Stat. Ann. § 29-19-7A…………………………………………………………………...23

N.C. Stat. § 14-415.12(4) (effective Oct. 1, 2022)…………………………………………...22

N.Y. Penal Law § 265.00(10)…………………………………………………………....28, 29

N.Y. Penal Law § 265.01……………………………………………………………………...4

N.Y. Penal Law § 400.00(1)(b)…………………………………………………......3-4, 18-19

N.Y. Penal Law § 400.00(1)(o)……………………………………………………3-5, 24, 26

N.Y. Penal Law § 400.00(4-a)…………………………………………………………...27, 29

N.Y. Penal Law § 400.00(4-b)………………………………………………………………..4

N.Y. Penal Law § 400.00(15)………………………………………………………...4, 9, 29

N.Y. Penal Law § 400.00(19)……………………………………………………………...3, 4

Ohio Rev. Code § 2923.125…………………………………………………………………22

Or. Rev. Stat. Ann. § 166.291(1)(f)………………………………………………………...22

R.I. Gen. Laws § 11-47-11…………………………………………………………………..19

R.I. Gen. Laws § 11-47-16………………………………………………………………...22

S.C. Code § 23-31-215(A)(5)……………………………………………………………….22

Tenn. Code Ann. § 39-17-1366(b)(4)(A)…………………………………………………...22

Va. Code § 18.2-308.02(B)………………………………………………………………….22

W.Va. Code § 61-7-4(e)…………………………………………………………………….22

Wis. Stat. Ann. § 175.60(4)………………………………………………………………...22

Wyo. Stat. Ann. § 6-8-104(b)(vii)………………………………………………………….22

## Historical Statutes and Authorities

1 Records of Mass. 1628-1641 (Nathaniel B. Shurtleff, ed. 1853)………………………….15

1 William Hawkins, A Treatise of the Pleas of the Crown, at 136, ch. 63, § 9………………17

1776-1777 Pa. Laws ch. XXI, §§ 1, 4……………………………………………...15, 20

1779 N.Y. Laws 237………………………………………………………………………...23

1779 N.Y. Laws, ch. 55……………………………………………………………………...16

1782 N.Y. Laws 442-43……………………………………………………………………...23

1806 NJ Laws 565……………………………………………………………………………..23

1881 Ordinances of the Mayor, Aldermen and Commonality of the City of New York art. XXVII, § 265 (rev. Elliott F. Shepard & Ebenezer B. Shafer, 1881)……………...17, 20-21, 28

Act for Establishing and Conducting the Military Force of New-Jersey, 1806 N.J. Laws 536……………………………………………………………………………………16

Act of March 14, 1776, in 1775-1776 Mass. Acts & Laws 31……………………………15

An Act for the Better Security of the Government, 1777, in Maryland Session Laws…………..15

An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government (1756), in 7 William W. Hening, *The Statutes at Large, Being a Collection of all the Laws of Virginia* 35-36 (Richmond: Franklin Press, 1809)………………………14

An Act for Regulating the Militia of the State of New York (1780)……………………….16

An Act for Regulation of the Militia of this Commonwealth, 1822 Penn. Laws 316, 340……….16

An Act to Amend An Act for Declaring What Crimes and Practices Against the State Shall Be Treason, . . . and for Preventing the Dangers Which May Arise From Persons Disaffected to the State, 1777, in North Carolina Session Laws………………………………...15

An Act to Oblige the Free Male Inhabitants of this State Above a Certain Age to Give Assurances of Allegiance to the Same (1777), in 9 William W. Hening, *The Statutes at Large, Being a Collection of all the Laws of Virginia* 281, 281-82 (1821)………………….15, 16

An Act to Prohibit the Selling of Guns, Gunpowder or Other Warlike Stores to the Indians (1763), *in* 6 *The Statutes at Large of Pennsylvania From 1682 to 1801,* at 319-20 (WM Stanley Ray 1899)…………………………………………………………………14

An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes § 2, Public Law 52-159, 27 Stat. 116, 116-17 (1892)…………………………………………………………………………………17

An Act to Regulate the Militia (1782), 1781 N.Y. Laws, ch. 27………………………….....16

*Compiled Ordinances of the City of Omaha,* ch. XXXI, § 6 (Champion S. Chase ed., 1881)……..21

Henning, *Collection of All the Laws of Virginia*…………………………………………….24

John Carpenter, Liber Albus: The White Book of the City of London 335 (Henry Thomas Riley ed., London, 1861)……………………………………………………………....17

*Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New York*, 1775-1776-1777, at 389 (1842)…………………16

Militia Act of 1662, 13 & 14 Car. 2, c. 3 § 13 (1662)……………………………………...15, 21

Order of Mass. General Court of 1648, *reprinted in* The Laws and Liberties of
Massachusetts 28 (Harvard Univ. Press 1929)……………………………………………..14

Thomas Greenleaf, *Laws of the State of New-York* (1792)…………………………...……23-24


**Other Authorities**

David C. Williams, *Civic Republicanism and the Citizen Militia: The Terrifying Second
Amendment*, 101 Yale L.J. 551, 580 (Dec. 1991)………………………………………………..24

NY Senate Bill S51001 (2021-22 Leg. Sess.), Sponsor Memo……………………………………3

Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to
Concealed Carry* (2018)………………………………………………………………………17

Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus
Ahistorical Standards of Review*, 60 Cleveland St. L. Rev. 1, (2012)…………………………...17

Texas House of Representatives Investigative Committee on the Robb Elementary
Shooting, Interim Report 2022……………..……………………………………………………25

Defendant Steven Nigrelli, sued in his official capacity as Acting Superintendent of the New York State Police (the "Superintendent"), respectfully submits this memorandum of law, together with the Declaration of Assistant Attorney General Patricia M. Hingerton ("HD") with exhibits, in opposition to that portion of the motion for a preliminary injunction filed by Plaintiffs Zachary Giambalvo, John Mougios, Shane Mashkow, Kevin McLaughlin, Michael McGregor, Frank Melloni, and Renaissance Firearms Instruction, Inc. ("Plaintiffs") as raises a constitutional challenge to various provisions of New York State's Concealed Carry Improvement Act ("CCIA").

## PRELIMINARY STATEMENT

In this application, Plaintiffs seek an injunction against Suffolk County and its officials (the "County Defendants") on numerous grounds, including an assertion that various provisions of the CCIA are facially unconstitutional. *See, e.g.*, Memorandum of Law in Support of Plaintiffs' Application for a Preliminary Injunction, ECF No. 27-14 at 14-16. Although Plaintiffs have not sought relief in the Order to Show Cause directly against the Superintendent, he submits this opposition to address only the facial constitutional challenges raised in the motion.

Plaintiffs—four individuals who seek a concealed carry handgun license, one individual who seeks to amend his restricted handgun license, a firearms training company, and its president[1]—filed the complaint in this action on August 15, 2022 against the County Defendants under 42 U.S.C. § 1983 claiming violations of their First, Second, Fourth, and Fourteenth Amendment rights arising from the County Defendants' alleged policies on handgun licensing. On November 17, 2022, plaintiffs amended their complaint to, among other things, add the Superintendent as a defendant and add facial challenges to five different provisions of the CCIA.

---

[1] Plaintiffs Melloni and Renaissance Firearms Instruction, Inc. only challenge Suffolk County policy regarding firearms training, and therefore, they will not be discussed further herein.

1

*See* First Amended Complaint ("AC" ECF No. 13).  Plaintiffs waited until December 11, 2022 to move for preliminary injunctive relief.

Plaintiffs' application for a preliminary injunction against enforcement of the CCIA should be denied for any number of reasons.  First, Plaintiffs lack standing to challenge the CCIA, meaning that this Court need not even address the constitutional claims.  Second, Plaintiffs fail to make a strong showing of imminent and irreparable harm (particularly given their unexplained delay in challenging a statute that was enacted months earlier), let alone any harm attributable to the CCIA provisions they challenge.  Third, even if the Court is inclined to reach the merits, the Plaintiffs have no likelihood of success on their facial constitutional challenge because the statutory provisions fully comport with the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen,* 142 S. Ct. 2111 (2022).  And fourth, the equities clearly weigh against interim injunctive relief and heavily in favor of New York's duty to keep weapons out of the hands of those who may use them to harm others.

## BACKGROUND

A. *New York State Rifle & Pistol Association v. Bruen*

In *Bruen*, the Supreme Court held that the "plain text" of the Second Amendment protects the right of "ordinary, law-abiding citizens" to "'bear' arms in public for self-defense." 142 S. Ct. at 2122, 2135. It ruled that when "the Second Amendment's plain text covers an individual's conduct," the government must then demonstrate that its regulation is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126, 2129-30. But in cases that require this historical analysis, the government need only identify a "historical analogue" that is "relevantly similar" to the challenged regulation—not a "historical twin." *Id.* at 2132-33.

Applying this test, the Court found that a single provision of New York's concealed carry licensing regime was unconstitutional: the requirement that an applicant demonstrate "proper cause" to obtain a concealed carry license, *i.e.*, a showing of a specific self-defense need beyond that of the public at large. *Id.* at 2123. Significantly, the Court also made clear that "nothing in our analysis should be interpreted to suggest the unconstitutionality of . . . 'shall-issue' licensing regimes," which "often require applicants to undergo a background check or pass a firearms safety course." *Id.* at 2138 n.9 (cleaned up). Such measures are permissibly "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.*

### B. **The CCIA**

On July 1, 2022, the CCIA was passed by the New York State Legislature and signed into law by Governor Hochul. The bill was drafted "to align with the Supreme Court's recent decision in []*Bruen*," Press Release, July 1, 2022, available at https://on.ny.gov/3BM6Hz7, by eliminating the requirement that applicants for concealed carry licenses demonstrate proper cause. *See* NY Senate Bill S51001 (2021-22 Leg. Sess.), Sponsor Memo. As relevant here, the CCIA added a definition for the longstanding requirement of "good moral character" for a handgun license, a provision which had previously been held constitutional by the Second Circuit. Specifically, the CCIA defined the term "good moral character" to mean "having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." Penal Law § 400.00(1)(b).

The CCIA also revised the licensing process, requiring that every applicant "shall meet in person with the licensing officer for an interview," *id.*, § 400.00(1)(o), complete sixteen hours of training and two hours of live-fire instruction, *id.* §§ 400.1(o)(iii), 400.00(19), and submit statutorily specified information, *id.* § 400.00(1)(o)(i)-(v). The latter includes the "names and

3

contact information of no less than four character references who can attest to the applicant's good moral character and that such applicant has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others," *id.* § 400.00(1)(o)(ii), and the "names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing . . . in the applicant's home," *id.* § 400.00(1)(o)(i).  Applicants must also provide "a list of former and current social media accounts . . . from the past three years to confirm" that information. *Id.* § 400.00(1)(o)(iv). Under Section 400.00(4-b), licensing officers are required to act upon license applications within six months of presentment, unless written notice is provided to the applicant.  Licensed firearm owners in New York are largely exempt from laws criminalizing firearms possession; instead of being subject to charges under those laws, N.Y. Penal Law §§ 265.01 *et seq.*, any violations of the firearms laws are treated as a violation of the terms of their license under N.Y. Penal Law § 400.00(15), which is a misdemeanor. *See generally Frey v. Bruen*, No. 21 Civ. 5334, 2022 U.S. Dist. Lexis 31053, at *15-*16 (S.D.N.Y. Feb. 22, 2022).

C. **The Instant Application**

On December 11, 2022 – 23 weeks after the CCIA was enacted, 16 weeks after this case was filed, and 14 weeks after the CCIA's provisions went into effect – Plaintiffs moved for a preliminary injunction against defendants' implementation and enforcement of Penal Law §§ 400.00(1)(b) (good moral character requirement); 400.00(1)(o) (requirements for an in-person interview; character references; list of cohabitants; social media accounts; other information requested by the licensing officer); 400.00(19) (training requirement); 400.00(4-b) (requirement to act on an application within six months); and 400.00(15) (misdemeanor for violations of §

4

400.00; here, limited to those who carry outside their license restriction). The supporting declarations submitted by Plaintiffs allege, in relevant part, as follows:

Plaintiff Giambalvo avers that in February 2020, he submitted a county application for a concealed carry license to the Suffolk County Police Department ("SCPD") Licensing Bureau. *See* Giambalvo Decl., ¶7. After he learned that the application fee had not been received, Giambalvo completed another application in or around June 2022, following which SCPD advised that there was an approximately a year and one-half to two year wait before he would hear from an investigator to schedule his in person interview. *Id.* at ¶¶ 8-10. Giambalvo avers that he will not appear for an in-person interview, nor provide the information required by the CCIA under § 400.00(1)(o). *Id.* at 14-15.

Plaintiff Mougios avers that in July 2021, he applied to the SCPD for a concealed carry license but has not yet been assigned to an investigator and will not be scheduled for an interview for up to another year based on SCPD procedures. *See* Mougios Decl.,¶¶ 8-9. Mougios challenges the good moral character requirement, and claims that he will not appear for an in-person interview, provide the information required by the CCIA under § 400.00(1)(o), or take the required training. *Id.* at ¶¶ 5, 12, 15-16.

Plaintiff Mashkow applied to the SCPD for a concealed carry license on an undisclosed date, and then contacted the SCPD in or around November/December 2021 to check on the status, at which point he learned that his fee had not been received. *See* Mashkow Decl.,¶ 10. Mashkow reapplied in February 2022 and was advised by the SCPD that he "should get an appointment sometime in February 2024." *Id.* at ¶¶ 11-12. Mashow objects to the fees he was quoted by a local business for taking the 18-hour training required by the CCIA. *Id.* at ¶¶ 17-18.

5

Plaintiff McLaughlin submitted an unsigned declaration, which, therefore, should not even be considered. Notwithstanding this deficiency, he alleges that he applied to the SCPD for a concealed carry license in July 2022, following which he contacted the SCPD, and was advised that he "would not be called in...for approximately 3 years-in and around July 2025." McLaughlin Decl., ¶¶ 4-5 (emphasis omitted). McLaughlin "objects to all of the regulations enacted under the [CCIA]," but, in particular, "will not spend the money and time to attend the 18-hour training course." *Id.* at ¶ 7.

Plaintiff McGregor applied to the SCPD for a handgun license in 2020 and obtained a restricted license limited to sportsman activities on March 24, 2022. McGregor Decl., ¶¶ 5, 16, 18. On August 15, 2022, prior to the enactment of the CCIA, McGregor filed an application with the SCPD to amend his license to remove the restriction, and that application remains pending. *Id.* at ¶¶ 20-21. McGregor objects to the training requirement and he intends – at some point – to carry outside of his sportsman restriction. *Id.* at ¶¶ 24, 26-27.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). The burden is on Plaintiffs to establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20. The final two factors—the balance of the equities and the public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).[2]

---

[2] Plaintiffs claim that balancing the equities "is no longer viable in the context of a Second Amendment challenge," ECF No. 27-14 at 20, but they are wrong. *Bruen* was an appeal from the grant of a motion to dismiss. Contrary to Plaintiffs' suggestion, nothing in *Bruen*'s holding indicates that it implicitly changed the long-settled preliminary injunction standard. Federal courts have continued to apply the balance of the equities requirement to preliminary injunction motions made after *Bruen*, and at least one court has denied a preliminary injunction motion based on the equities alone. *See Baird v. Bonta*, No. 19-cv-617, 2022 U.S. Dist. Lexis 221461 (E.D. Cal. Dec. 8, 2022).

Where, as here, plaintiffs ask the Court to enjoin the enforcement of a duly enacted statute, plaintiffs must make "a heightened showing . . . consistent with the principle that 'governmental policies implemented through legislation . . . are entitled to a higher degree of deference and should not be enjoined lightly.'" *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995). Plaintiffs must show a "clear" or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm. *People ex. rel. Schneiderman v. Actavis PLLC*, 787 F.3d 638, 650 (2d Cir. 2015). As discussed below, Plaintiffs have not made the requisite showing.

## ARGUMENT

### POINT I:  PLAINTIFFS LACK STANDING TO CHALLENGE THE CONSTITUTIONALITY OF THE CCIA

Unless a plaintiff has Article III standing, a court lacks subject matter jurisdiction to hear his claim. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  To establish Article III standing, a plaintiff bears the burden of establishing three "irreducible constitutional minimum" elements.  *Id.* at 560.  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

### A.  Plaintiffs Have Not Suffered an "Injury-in Fact" Related to the CCIA Licensing Provisions

Plaintiffs lack standing to challenge the CCIA's licensing provisions because their applications for a carry license have not been denied.   In fact, except for McGregor, none of the Plaintiffs has even completed and submitted the Pistol/Revolver Application PPB-3 form ("PPB-3") to SCPD, and none will do so until 2024 at the earliest. *See* AC, ¶ 248 ("[N]o Plaintiff will

7

be…provided with the [PPB-3] until some Wednesday in 2024 at the earliest."). As to McGregor, he already submitted a PPB-3 to obtain his carry license before the requirements of the CCIA went into effect, and received a license; while he also submitted an amendment to his license to remove his sportsman restriction, that has not yet been denied by SCPD.[3] *See* McGregor Decl., ¶¶ 5, 16, 19-21. Thus, none of the Plaintiffs has been required to disclose to SCPD the licensing information to which they object (i.e., character references; list of cohabitants; compliance with training requirement; social media accounts; other information required by the licensing officer), nor have they been subjected to an in-person interview or had an evaluation of their moral character.

Plaintiffs, therefore, have not yet suffered the injury-in-fact required for standing, which is fatal to their claim. *See Libertarian Party of Erie Cnty. v. Cuomo,* 970 F.3d 106, 122 (2d Cir. 2020), *abrogated in part on other grounds by Bruen*, 142 S. Ct. 2111[4] (only plaintiffs who had their applications denied alleged an injury-in fact); *United States v. Decastro*, 682 F. 3d 160, 164 (2d Cir. 2012) (holding that plaintiff who failed to apply for a New York gun license lacked standing to challenge the state's licensing laws), *cert. denied*, 568 U.S. 1092 (2013). Although an individual may also have standing if he is able to make a "substantial showing" that completing his application and obtaining a decision would be futile, *Libertarian Party*, 970 F.3d at 116, Plaintiffs here have not done so. A plaintiff may show futility where it is clear that his application would be denied based on immutable characteristics or, at the very least, characteristics that are not easily altered. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977) (minority persons deterred by "Whites Only" employment policy would suffer injury); *Bach v.*

---

[3]  Virtually all of the CCIA's application requirements "shall apply only to licenses for which an application is made on or after" September 1, 2022.  2022 N.Y. Laws 371 § 26(a).

[4]  The *Bruen* decision abrogated the Second Circuit's decision in *Libertarian Party*, 970 F.3d 106, only to the extent *Libertarian Party* (1) upheld New York's "proper cause" requirement under the Second Amendment; and (2) applied "means-ends" scrutiny to plaintiffs' Second Amendment challenge. *Bruen*, 142 S. Ct. at 2127 & n.4. The Second Circuit's decision otherwise remains controlling precedent, including its rulings relating to the circumstances in which an applicant for a firearms license may, or may not, have standing to sue.

*Pataki*, 408 F.3d 75, 82-83 (2d Cir. 2005) (plaintiff's application for a concealed carry license was futile where he was not a New York resident and thus statutorily ineligible), *overruled on other grounds by*, *McDonald v. Chicago*, 561 U.S. 742 (2010). In contrast, a plaintiff fails to demonstrate futility where he opts not to complete an application despite being able to do so. This is because "a plaintiff must submit to the challenged policy" and "[m]ere objection or antipathy to the law" does not constitute futility. *Libertarian Party*, 970 F.3d at 121, 116; *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1097-98 (2d Cir. 1997) (plaintiff did not show futility in challenge to prison's religious worship policy where he did not complete a registration form but could have done so).[5]

### B. **Plaintiffs Have Not Suffered an Injury-in-Fact Related to Penal Law §400.00(15)**

McGregor is the only Plaintiff who currently possesses a carry license restricted to sportsman activities, *see* McGregor Decl., ¶ 16-18, and therefore, is the sole Plaintiff who could seek to enjoin enforcement of Section 400.00(15) against licensees who carry outside of their restriction. McGregor, however, has not demonstrated injury-in-fact to challenge this statute.

Where, as here, a plaintiff is trying to challenge a statute that has never been enforced against him, "pre-enforcement review is available where the 'circumstances render the threatened enforcement sufficiently imminent,' which can be established 'by plausible allegations that a plaintiff intends to engage in conduct proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Frey*, 2022 U.S. Dist. Lexis 31053, at *12 (quoting *Adam v. Barr*, 792 F. App'x 20, 21-22 (2d Cir. 2019) (summary order)).

Here, McGregor fails to plead sufficient facts to demonstrate a concrete plan to carry outside of his restriction. He merely avers—in overly generalized and entirely conclusory

---

[5] Nor can Plaintiffs create their own futility by unilaterally refusing to comply with legal requirements they dislike. *See Williams v. King*, 56 F. Supp. 3d 308, 326 (S.D.N.Y. 2014) (no standing where plaintiff "declined to comply with the policy . . . and there is no evidence in the record to suggest that compliance would have been futile.").

fashion—that he intends to "carry [his] registered handgun in public for self-protection outside of [his] sportsman restriction." McGregor Decl., ¶26. But such "'some day' intentions—without any description of concrete plans, or indeed even any specification *when* the some day will be—do not support a finding of the actual or imminent injury' that is required." *Frey*, 2022 U.S. Dist. Lexis 31053, at *12-13 (plaintiffs challenging firearms lack standing law even when they alleged that they "intend to" carry firearms unlawfully, where they did not allege "concrete plans" to do so).

Plaintiff McGregor similarly fails to allege an injury-in-fact because he has not pleaded facts that indicate a credible threat of prosecution.[6]   *See* AC, ¶ 231. Although courts generally presume that the government will enforce its laws, 'the mere existence of a law prohibiting intended conduct does not automatically confer Article III standing.'" *Sibley v. Watches*, 501 F. Supp. 3d 210, 222 (W.D.N.Y. Nov. 16, 2020) (quoting *Adam*, 792 F. App'x at 22). Like the plaintiffs in *Adam*, *Sibley*, and *Frey*, Plaintiff McGregor "does not allege that the [CCIA] has been enforced against him in the past or that anyone threatened him with prosecution." *Id.* at 223. Instead, he "infers that because the Penal Laws exist, he will be prosecuted once he carries his firearms outside the confines of his license." *Frey*, 2022 U.S. Dist. Lexis 31053, at *13 (changed to the singular). This provides no basis for a credible threat of prosecution, as a matter of law, much less a basis for a credible threat of prosecution from the Superintendent. *See Does v. Suffolk Cnty.*, 2022 U.S. App. Lexis 19094, at *6-*8 (2d Cir. July 12, 2022) (affirming this Court's finding of no standing even where plaintiffs had received letters from police ordering surrender of their firearms, and did not do so).

---

[6]  Plaintiffs' suit is not constitutionally ripe for the same reasons, which also requires dismissal. *See, e.g.*, *Young Advocs. for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215, 238 (E.D.N.Y. 2019).

**POINT II:  PLAINTIFFS HAVE NOT MADE A STRONG SHOWING OF IMMINENT AND IRREPARABLE HARM FROM THE CHALLENGED CCIA PROVISIONS**

As a threshold matter, Plaintiffs' unreasonable delay in bringing this motion negates any finding of imminent and irreparable harm.  A moving party must act diligently to enforce his rights since delay "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable harm." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (internal quotes and cites omitted).  Here, the CCIA was passed on July 1, 2022, and Plaintiffs commenced this litigation on August 15, 2022, but they did not seek a preliminary injunction until December 11, over five months after the statute was enacted into law and over three months after it became effective.  And they offer no reason for their inaction.

Even if the delay could be excused, Plaintiffs have not demonstrated any imminent irreparable harm from the CCIA.  To show irreparable harm, the moving party must demonstrate that his "injury is neither remote nor speculative, but actual and imminent." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999).  Plaintiffs have not demonstrated that any of the CCIA provisions they challenge – such as the requirement that an applicant have good moral character, or the requirement that an applicant appear before a licensing officer in-person – will result in the denial of their applications, or otherwise interfere with their right to bear arms.  And Plaintiff McGregor has no harm—much less irreparable harm—as a result of carrying outside his sportsman restriction since he fails to plead sufficient facts to demonstrate a concrete plan to do so or a credible threat of prosecution.

**POINT III:  PLAINTIFFS HAVE NOT SHOWN A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR SECOND AMENDMENT CHALLENGES TO THE CCIA**

Plaintiffs raise a facial challenge to the CCIA, but such challenges "are generally disfavored." *Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010).  To prevail, Plaintiff must

show that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs plainly fail to meet this high bar with respect to any of the CCIA provisions they challenge.

### A. **Plaintiffs Fail To Carry Their Burden On The First Part Of The *Bruen* Test**

As the movants, "Plaintiffs bear the initial burden of establishing a likelihood of success on the merits." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 (2d Cir.), *cert. denied*, 142 S. Ct. 2569 (2022). As relevant here, and as plaintiffs concede (ECF No. 27-14 at 9-10), only when a challenger shows that "the Second Amendment's plain text covers an individual's conduct" must the government then demonstrate that its regulation is nonetheless "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2129-30. The first step entails an analysis of "the Second Amendment's text, as informed by history." *Id.* at 2127; *see also District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).

Plaintiffs barely even attempt to carry their burden on this point. Instead, plaintiffs merely assert that "[b]ecause the plain text of the Second Amendment covers Plaintiffs' conduct – the possession and carriage of a handgun for self-defense[,] their conduct is 'presumptively protected' by the Second and Fourteenth Amendments." ECF No. 27-14 at 10. But none of the challenged statutes prohibit the possession or carriage of handguns, unlike the law at issue in *Heller*, which "virtually banned the possession of handguns in the home," or the one in *Bruen*, which "virtually banned the possession of handguns in public." *United States v. Tilotta*, No. 19-cr-4768, 2022 U.S. Dist. Lexis 156715, at *14 (S.D. Cal. Aug. 30, 2022). Other federal courts have cautioned against a reductive version of the plain text analysis that distills any regulation down to "possession." *United States v. Reyna*, No. 21-CR-41, 2022 U.S. Dist. Lexis 225896, at *9 (N.D. Ind. Dec. 15,

2022); *accord Tilotta*, 2022 U.S. Dist. Lexis 156715, at \*14-\*15 ("simply because a law involves firearms does not mean that the Second Amendment is necessarily implicated").

The conduct at issue here is not simply "the possession and carriage of a handgun for self-defense," as the Plaintiffs would have it.  ECF No. 27-14 at 10.  Instead, the question is whether the plain text of the Second Amendment provides for possession of a handgun *without good moral character*, possession of a handgun *without training*, or possession of handgun *without following basic licensing procedures*.  This was Plaintiffs' burden to show – not to simply brush away in a single sentence – and federal courts since *Bruen* have regularly rejected arguments made by parties who fail to demonstrate that their conduct fell within the Second Amendment's plain text.  *See, e.g., Gazzola v. Hochul*, No. 22 Civ. 1134, 2022 U.S. Dist. Lexis 220168, at \*35 (N.D.N.Y. Dec. 7, 2022) (denying preliminary injunction where "Plaintiffs fail to present any support for their contention that the individual right secured by the Second Amendment applies to corporations or other business organizations"); *Tilotta*, 2022 U.S. Dist. Lexis 156715, at \*13-\*14; *United States v. Gonzalez*, No. 22-CV-54, 2022 U.S. Dist. Lexis 224710, at \*5 (D. Utah Dec. 12, 2022) (rejecting argument by party who "put forth no arguments to demonstrate how [laws prohibiting false statements to acquire firearms] regulate or restrict conduct protected by the Second Amendment"); *Or. Firearms Fed., Inc. v. Brown*, No. 22-cv-1815, 2022 U.S. Dist. Lexis 219391, at \*25 (D. Or. Dec. 6, 2022) (denying TRO where "Plaintiffs have failed to show that magazines capable of accepting more than ten rounds of ammunition are covered by the plain text of the Second Amendment").

**B.   The Nation's Historical Tradition of Firearms Regulation Supports Provisions Aimed at Ensuring That Only Law-Abiding and Responsible Persons Are Armed**

Although the Court can and should deny the motion based on Plaintiffs' failure to demonstrate that the challenged statutes implicate the Second Amendment's plain text, *see, e.g., Reyna*, 2022 U.S. Dist. Lexis 225896, at *9; *Tilotta*, 2022 U.S. Dist. Lexis 156715, at *14-*15, the statutes are manifestly constitutional on the second *Bruen* step, as American legal history demonstrates that measures to keep guns out of the hands of dangerous persons are fully "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

From the early days of English settlement in America, governments prohibited the possession of firearms by persons deemed dangerous.[7] For example, colonial governments prohibited the sale and trading of arms to Indigenous people,  see Order of Mass. General Court of 1648, *reprinted in* The Laws and Liberties of Massachusetts 28 (Harvard Univ. Press 1929), HD Ex. 1; An Act to Prohibit the Selling of Guns, Gunpowder or Other Warlike Stores to the Indians (1763), *in 6 The Statutes at Large of Pennsylvania From 1682 to 1801,* at 319-20 (WM Stanley Ray 1899), HD Ex. 2, and the possession of firearms by Catholics who refused to take an oath of loyalty to the government, following English statutes doing the same, An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government (1756), in 7 William W. Hening, *The Statutes at Large, Being a Collection of all the Laws of Virginia* 35-36 (Richmond: Franklin Press, 1809), HD Ex. 3. The Massachusetts Bay Colony disarmed a list of named followers of a dissident preacher named John Wheelwright because there was "just cause of

---

[7] Although these laws reflect the broad pre- and post-Founding understanding that gun possession could be restricted in cases where a person was dangerous or unfit, they (and others in the historical analysis discussed in this section) are based on racial or religious animus that is repugnant to a modern understanding of the Constitution. *Cf. Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 867 (2017) ("It must become the heritage of our Nation to rise above the racial classifications that are so inconsistent with our commitment to the equal dignity of all persons."). A clear-eyed look at American history and doctrine will necessarily reveal episodes that are shameful but nonetheless relevant, as the *Bruen* opinion teaches us. *See* 142 S. Ct. at 2150-51. Of course, if a modern instance were to arise where gun licensing requirements were applied in a discriminatory manner, it could, should, and would be struck down as unconstitutional.

14

suspition that they . . . may, upon some revelation, make some suddaine irruption upon those that differ from them in judgment." 1 Records of Mass. 1628-1641, at 211-12 (Nathaniel B. Shurtleff, ed. 1853), HD Ex. 4; *see also generally* Militia Act of 1662, 13 & 14 Car. 2, c. 3 § 13 (1662), HD Ex. 5 (allowing royal officials to "search for and seize all arms in the custody or possession of any person or persons whom the said Lieutenant or two or more of their deputies shall judge dangerous to the peace of the Kingdom."). It was thus commonly understood at the time of the Second Amendment's ratification that authorities could disarm persons believed to pose a threat to public safety. *See United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012) ("Colonial governments often barred 'potential subversives' from owning firearms.").

Moreover, in the period prior to and during the Revolutionary War, numerous colonies required individuals suspected of disloyalty to appear in person to take an oath, or face disarmament. Massachusetts, for instance, had a law "disarming such persons as are notoriously disaffected to the cause of America." Act of March 14, 1776, in 1775-1776 Mass. Acts & Laws 31, HD Ex. 6. Once an individual had been deemed disaffected, he could often only regain his right to bear arms by appearing in person before an official to swear an oath of loyalty. In Pennsylvania, all white male inhabitants were required to appear "before some one of the justices of the peace of the city or county where they shall respectively inhabit" to take a prescribed oath of allegiance, and if they failed to do so, they were "disarmed by the lieutenant or sublieutenants of the city or counties respectively." 1776-1777 Pa. Laws ch. XXI, §§ 1, 4, at 61-63, HD Ex. 7. Other colonies adopted similar provisions. *See* An Act for the Better Security of the Government, 1777, in Maryland Session Laws, HD Ex. 8; An Act to Amend An Act for Declaring What Crimes and Practices Against the State Shall Be Treason, . . . and for Preventing the Dangers Which May Arise From Persons Disaffected to the State, 1777, in North Carolina Session Laws, HD Ex. 9; An

15

Act to Oblige the Free Male Inhabitants of this State Above a Certain Age to Give Assurances of Allegiance to the Same (1777), in 9 William W. Hening, *The Statutes at Large, Being a Collection of all the Laws of Virginia* 281, 281-82 (1821), HD Ex. 10. These measures were all taken at the behest of the Continental Congress of 1776. *See Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New York*, 1775-1776-1777, at 389 (1842), HD Ex. 11.

Character judgments also played a role in Founding-era statutes governing the militia, which provided for the disarmament and punishment of those who showed up to muster and demonstrated their unfitness to bear arms. Mustering laws contemplated that some individuals would be found personally unfit to bear arms and authorized officers to take action in these cases. *See, e.g.,* An Act for Regulating the Militia of the State of New York (1780), 1779 N.Y. Laws, ch. 55, HD Ex. 13 ("That if any dispute shall arise with respect to the age or ability to bear arms of any person, it shall be determined by the colonel or commanding officer of the regiment whose determination in the case shall be final."); An Act to Regulate the Militia (1782), 1781 N.Y. Laws, ch. 27, HD Ex. 14 (same). New Jersey law provided that if a member of the militia appeared drunk, disobeyed orders, used abusive language, quarreled, or instigated argument among other militiamen, "he shall be disarmed and put under guard, by order of the commanding officer present, until the company is dismissed, and shall be fined at the discretion of a regimental court martial." Act for Establishing and Conducting the Military Force of New-Jersey, 1806 N.J. Laws 536, 563, HD Ex. 15. Pennsylvania enacted a nearly identical provision in 1822. An Act for Regulation of the Militia of this Commonwealth, 1822 Penn. Laws 316, 340, HD Ex. 16.

At the time of ratification of the Fourteenth Amendment, Congress and the states began to implement firearm licensing regimes involving a discretionary determination of whether an

16

individual was potentially dangerous.[8] *See, e.g.,* An Act to punish the carrying or selling of deadly

or dangerous weapons within the District of Columbia, and for other purposes § 2, Public Law 52-

159, 27 Stat. 116, 116-17 (1892), HD Ex. 17; Patrick J. Charles, *Armed in America: A History of*

*Gun Rights from Colonial Militias to Concealed Carry* 156 & n.219 (2018) (collecting ordinances

from more than two dozen cities, passed between the mid-19th century and early 20th century,

requiring a permit to carry firearms in cities across the United States subject to the discretionary

determination of an official); *see also id.* at 157-62 & nn.220-247 (compiling evidence of "[b]road

public support for armed carriage laws" requiring individuals to demonstrate their fitness to carry

firearms).   These laws required individuals to demonstrate their suitability to carry firearms

through various means.   In New York City, for instance, an individual who wanted to carry a pistol

for his protection was obligated to appear for an in-person interview with a local officer.  1881

Ordinances of the Mayor, Aldermen and Commonality of the City of New York art. XXVII, § 265,

at 214-15 (rev. Elliott F. Shepard & Ebenezer B. Shafer, 1881), HD Exs. 18 & 19.   If, based on

this interview, the officer was "satisfied that the applicant is a proper and law-abiding person," the

officer would recommend that the superintendent of police issue a permit to the individual.  *Id.*

Similar discretionary licensing laws appeared in cities across the United States; from New York

alone examples of such laws appear in Brooklyn (at the time an independent city), HD Ex. 22 at

---

[8] Licensing was not a new invention of post-bellum America.   As early at the Fourteenth Century, English subjects were disallowed from carrying weapons without a license unless they were an officer of the peace. John Carpenter, Liber Albus: The White Book of the City of London 335 (Henry Thomas Riley ed., London, 1861), HD Ex. 20; Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Cleveland St. L. Rev. 1, 27 & n.129 (2012).  And the license to carry weapons was generally confined only to wealthy landowners and members of the nobility, who were presumed to be in no danger of committing violence or disturbing the peace.  1 William Hawkins, A Treatise of the Pleas of the Crown, at 136, ch. 63, § 9, HD Ex. 21 (allowing "Persons of Quality" to wear common weapons in public because they are unlikely to "cau[se] the leaft Suspicion of an intention to commit any Act of Violence or Disturbance of the Peace"); *see also* Charles, *The Faces of the Second Amendment Outside the Home*, 60 Cleveland St. L. Rev. at 26 & nn.122-23.  And individuals granted these licenses were required to appear before the Clerk of the Privy Council to register these licenses.  *See* Charles, *Faces of the Second Amendment*, 60 Cleveland St. L. Rev. at 27.

2; Buffalo, HD Ex. 23 at 176-77; Elmira, HD Ex. 24 at 3; Syracuse, HD Ex. 25 at 243; Troy, HD Ex. 26 at 425; Lockport, HD Ex. 27 at 337; and Albany, HD Ex. 28 at 849-50.

Federal courts both before and after the *Bruen* decision have considered these and other historical sources and concluded that American legal history supports measures preventing persons who are not law abiding, responsible citizens from having firearms. *See, e.g., Range v. Attorney General*, 53 F.4th 262, 282 (3d Cir. Nov. 16, 2022) (concluding that legislatures could disarm persons "not merely based on an individual's demonstrated propensity for violence, but rather to address the threat purportedly posed by entire categories of people to an orderly society and compliance with its legal norms"); *U.S. v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) ("most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"); *see also Libertarian Party*, 970 F.3d 106, 127 (2d Cir. 2020) (no Second Amendment violation where "the statute does not burden the ability of *law-abiding, responsible* citizens to use arms" (quotation omitted, emphasis in the original)).

### C. The Good Moral Character Requirement is Constitutional

This history supports New York's requirement that persons obtaining guns have good moral character, and the application requirements "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). Good moral character connotes the absence of "base or depraved" actions that are "manifestations of 'moral turpitude.'" *Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 263 (1957). Those without good moral character fall outside the Second Amendment's scope, as made clear by the *Bruen* Court's reference to the right of "law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S. Ct. at 2131; *cf.* N.Y. Penal Law

§ 400.00(1)(b) (requiring that a license applicant have "the essential character, temperament, and judgment necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others").

Moreover, the good moral character requirement is constitutional because it is equivalent to those in several of the "shall-issue" regimes that *Bruen* endorsed. *See, e.g.,* Ind. Code § 35-47-2-3(g) ("If it appears to the superintendent that the applicant . . . is of *good character and reputation* [and] is a *proper person* to be licensed . . . the superintendent *shall issue* to the applicant a license to carry a handgun in Indiana." (emphasis added)); Ga. Code Ann. § 16-11-129(d)(4) (judge "*shall issue* such applicant a license or renewal license to carry any weapon . . . unless the judge determines such applicant has not met all the qualifications, is not of *good moral character*" (emphasis added)); *see also* Conn. Gen. Stat. § 29-28(b)[9] ("that such person is a suitable person to receive such permit"); R.I. Gen. Laws § 11-47-11 ("if it appears . . . that he or she is a suitable person to be so licensed"); *cf. Bruen*, 142 S. Ct. at 2123 n.1 (citing each of the above statutes as examples of permissible licensing regimes).[10]  As *Bruen* emphasized, "nothing in our analysis should be interpreted to suggest the unconstitutionality of" these laws." 142 S. Ct. at 2138 n.9.

---

[9] As the *Bruen* court noted, Connecticut is a "shall issue" jurisdiction even though its law gives officials "discretion to deny a concealed-carry permit to anyone who is not a "suitable person," a standard interpreted to preclude permits only to those "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon." 142 S. Ct. at 2123 n.1 (quoting *Dwyer v. Farrell*, 193 Conn. 7, 12 (1984)).
[10] New York's revised standard focuses not on a judgment of an applicant's virtue, but rather on whether there are indicia that the person may be dangerous. Accordingly, although federal courts have been divided on whether the Second Amendment requires that a person be dangerous in order for him or her to be disarmed, *compare Range*, 53 F.4th at 282 (disarmament not limited to being "merely based on an individual's demonstrated propensity for violence") *with Kanter v. Barr*, 919 F.3d 437, 469 (7th Cir. 2019) (Barrett, J., dissenting) (person cannot be disarmed "[a]bsent evidence that [he] would pose a risk to the public safety if he possessed a gun"), the fact that New York's standard is based on an assessment of dangerousness means it would pass muster in either scenario.

### D. **The Licensing Requirements Are Constitutional**

**In-Person Interview**. To ensure that only "law-abiding, responsible citizens" carry arms in public, *Bruen,* 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635), states may permissibly require applicants to undergo a "background check." *Id.* at 2138 n.9; *see also id.* at 2162 (Kavanaugh, J., concurring) ("[S]hall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements."). New York's interview requirement allows an officer to speak directly with the applicant to assess their veracity and ask any clarifying questions necessitated by the individual's application.

Plaintiffs have failed to show how or why any of the challenged measures unduly burdens the rights of law-abiding responsible persons to carry guns for self-defense. *See Bruen*, 142 S. Ct. at 2129-30 (Plaintiff must demonstrate that "the Second Amendment's plain text covers an individual's conduct," and "[t]he government must then justify its regulation" historically). In any event, this requirement finds ample historical support. As discussed above, colonial statutes disarming groups deemed dangerous frequently allowed exceptions if someone appeared in person to swear an oath, while Revolutionary loyalty laws directly required in-person appearances. *See, e.g.,* 1776-1777 Pa. Laws ch. XXI, §§ 1, 4, at 61-63, HD Ex. 7 (persons must appear "before some one of the justices of the peace of the city or county where they shall respectively inhabit" or be disarmed). Militia mustering laws likewise required citizens to appear in-person to be inspected, while Reconstruction-era licensing laws, such as New York's, also called for an in-person appearance. *See, e.g.,* 1881 Ordinances of the Mayor, Aldermen and Commonality of the City of New York art. XXVII, § 265, at 214-15 (rev. Elliott F. Shepard & Ebenezer B. Shafer, 1881), HD

20

Exs. 18 & 19 (person "who has occasion to carry a pistol for his protection[] may apply to the officer in command at the station-house of the precinct where he resides").

**Character References**. The CCIA's requirement that an applicant provides four character references is likewise necessary to verify the information in the person's application and is analogous to the longstanding practice of evaluating a person's dangerousness in part on that person's reputation. Both English and colonial law disarmed individuals based on a reputation-based perception of the individuals' belonging to certain dangerous groups. *See, e.g.,* HD Ex. 3 (Virginia statute disarming persons where "any two or more justice of the peace, [] shall know, or suspect any person to be a Papist, or shall be informed that any person is . . ."); HD Ex. 4 (disarming named religious dissidents based on "just cause of suspition"). Colonies frequently disarmed people who were "notoriously disaffected to the cause of America, or who have not associated" with the "United Colonies." HD Ex. 6 at 32. And King Charles II of England authorized royal officials to seize the arms if his Lieutenant, or two or more of the lieutenant's deputies, thought the person seemed dangerous. Militia Act of 1662, 13 & 14 Car. 2, c. 3 § 13 (1662), HD Ex. 5; *see also Compiled Ordinances of the City of Omaha,* ch. XXXI, § 6 (Champion S. Chase ed., 1881), HD Ex. 30 (similarly limiting the concealed carrying of weapons to "well known and worthy citizens" and "persons of good repute"). In short, during the relevant period of American history, officials would consider a person's reputation and associations in evaluating whether he bore individual indicia of risk.

**Cohabitants**. Plaintiffs challenge the constitutionality of the CCIA's requirement that an applicant list the individuals who reside in his home, but their claim fails at Step 1 of the *Bruen* analysis: the requirement does not burden the right of responsible, law-abiding individuals to carry a firearm for protection. *See Tilotta* (rejecting plain text argument regarding forms that "simply

21

require [persons] to provide basic identifying information.  This is not equivalent to near total bans on the possession on handguns in the home or in public.  Therefore, the Second Amendment's text does not cover [movant]'s course of conduct.").  Moreover, even if the requirement imposed a burden on an applicant, it is analogous to the historical practices listed above, which considered an individual's associates when deciding whether that person could go armed.  In fact, the CCIA's provision is significantly less burdensome—it requires only disclosure of who lives in the applicant's home (and thus might have ready access to any firearm or trigger safe storage requirements) rather than considering all of an individual's associates and reputation or basing decisions off the individual's mere inclusion in a particular group.

**Training Requirement**.  The Supreme Court has recognized that "to bear arms implies something more than mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use." *Heller*, 554 U.S. at 617-18 (recognizing that the right to bear arms "cannot exist unless the people are trained to bearing arms").  Unsurprisingly then, 31 shall-issue jurisdictions besides New York require an individual to take a training course to obtain a concealed carry license.[11] The *Bruen* majority acknowledged that shall-issue licensing standards "often require applicants . . . to pass a firearms safety course." 142 S. Ct. at 2138 n.9.

While some Plaintiffs complain about the amount of training time required by the CCIA, *see, e.g.*, Mougios Decl., ¶¶ 12-13, the number of hours of training that New York requires is

_____

[11] *See* Alaska Stat. § 18.65.705(6); Ariz. Stat. § 13-3112(E)(6); Ark. Stat. § 5-73-309(13); Colo. Stat. § 18-12-203(1)(h)(VI); Conn. Gen. Stat. § 29-28(b); 11 Del. Code Ann. § 1441(a)(3); Fla. Stat. § 190.06(2)(h)(2)-(4); Idaho Stat. § 18-3302K(4)(c); 430 Ill. Stat. § 66/25(6); Iowa Stat. § 724.9; Kan. Stat. 75-7c04(b)(1); Ky. Stat. § 237.110(4)(i); La. Rev. Stat. § 1379.3(D); 25 Maine Stat. § 2003(1)(E)(5); Mich. Stat. § 28.425j; Minn. Stat. § 624.714; Mo. Stat. 571.101(2)(10); Mont. Stat. § 45-8-321(3); Nev. Rev. Stat. § 202.3657(3)(c); N.M. Stat. Ann. § 29-19-4(A)(10); N.C. Stat. § 14-415.12(4) (effective Oct. 1, 2022); Ohio Rev. Code § 2923.125; 21 Okla. Stat. Ann. § 1290.12(A)(2); Or. Rev. Stat. Ann. § 166.291(1)(f); R.I. Gen. Laws § 11-47-16; S.C. Code § 23-31-215(A)(5); Tenn. Code Ann. § 39-17-1366(b)(4)(A); Va. Code § 18.2-308.02(B); W.Va. Code § 61-7-4(e); Wis. Stat. Ann. § 175.60(4); Wyo. Stat. Ann. § 6-8-104(b)(vii).

22

not unique or out of step with other jurisdictions. *See, e.g.,* 430 Ill. Comp. Stat. 66/75(b) ("at least 16 hours, which includes range qualification time"); Cal. Penal Code § 26165(a)(3), (c) ("up to a maximum of 24 hours" and "shall include live-fire shooting exercises on a firing range"); N.M. Stat. Ann. § 29-19-7A ("not less than fifteen hours in length"); 13 Alaska Admin. Code § 30.070(a)(1)(A) (curriculum must "include[] at least 12 hours of training in the use of handguns . . . including a test of competence with a handgun"). And the requirement is consistent with historical analogues. From the very beginning of American history, training in the use of arms was required as part of a citizen's mandatory duty to serve in the local militia. *See, e.g.,* 1779 N.Y. Laws 237, HD Ex. 29. For a New Yorker, militia trainings could occur up to six times per year. *See* 1779 N.Y. Laws 239, HD Ex. 29; *see also* 1782 N.Y. Laws 442-43, HD Ex. 14; *see United States v. Miller*, 307 U.S. 174, 181 (1939) (noting that Virginia's militia statute required that "there shall be a private muster of every company once in two months"). And the training sessions could be long: although most jurisdictions had no upward limit on the length of each training session, New Jersey ultimately enacted a law requiring that militia drilling would be capped at six hours per day. 1806 NJ Laws 565, HD Ex. 32. Compared with the dozens of hours of training, marching, and drilling required annually of every citizen during the Founding era, New York's training requirement is "consistent with, and even more lenient than, the training requirements of the 18th and 19th Centuries." *Corbett v. Hochul*, No. 22 Civ. 5867, HD Ex. 34 at 27:4-7 (S.D.N.Y. Nov. 29, 2022) (Schofield, J., ruling from the bench).

To the extent that Plaintiffs complain about the fees for this training, *see, e.g.*, Mashow Decl., ¶ 18, requiring individuals to bear the reasonable costs of their firearms training is entirely consistent with history. Militia statutes required "every citizen" to purchase all the materials required for service "at his own expence," and the materials were frequently expansive. Thomas

Greenleaf, *Laws of the State of New-York*, HD Ex. 12 at 228 (1792) (emphasis added); *see also* Militia Act, 1 Stat at 271, HD Ex. 31.  Similarly, the militia statutes provided that citizens were required to take time out of their schedules for training in arms, without separate compensation for doing so.  This necessarily involved a significant opportunity cost: militia "membership was service to the state that always disrupted one's chosen round of activities."  David C. Williams, *Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment*, 101 Yale L.J. 551, 580 (Dec. 1991).  However, the militia statutes did not require that the states compensate citizens for the time spent in mandatory training, instead reserving wages for times of "actual service."  Greenleaf, *Laws of the State of New-York*, HD Ex. 12 at 232; Henning, *Collection of All the Laws of Virginia*, HD Ex. 33 at 18-19.  Accordingly, "there's ample historical precedent not only for the training requirement but imposing costs in connection with the bearing of arms and licensure on the applicants." *Corbett*, HD Ex. 34 at 27:21-24.

**Social Media.** The social media disclosure requirement is meant only to "confirm the information regarding the applicant's character and conduct" provided by an applicant's character references. Penal Law § 400.00(1)(o)(iv). Accordingly, the information is reviewed as part of the dangerousness assessment discussed above and is well-grounded in longstanding traditions.

The Founders did not have social media, but that of course does not make the CCIA's requirement unmoored from historical precedents. *See Bruen,* 142 S. Ct. at 2132 (cases implicating "dramatic technological changes may require a more nuanced approach"). For example, loyalty oaths were a tool the Founders used to try to uncover the colonists' potentially dangerous beliefs. Thus, Pennsylvania justified its law requiring all white male inhabitants to swear allegiance on pain of disarmament by observing that "sundry persons" had "sordid and mercenary motives" to "withhold their service and allegiance" while others "rendered great and eminent service in

defence and support of . . . independence." HD Ex. 7. Loyalty oaths are a relevant analogue to the extent they sought to uncover a hidden propensity for dangerous behavior.

New York's social media disclosure requirement is, in fact, a critical factor in determining whether an applicant intends to threaten others. This is because a social media posting—perhaps even more than the other required disclosures—may reveal specific threats or indicators of violence that demonstrate an intent to use a weapon aggressively. This is not speculative: again and again, people who commit mass shootings leave a long trail of disturbing content on their social media accounts, often posted well before they legally purchase the guns used to commit their atrocities. For instance, a committee of the Texas House of Representatives found that in the year before his attack, the Uvalde shooter "began to demonstrate interest in gore . . . sometimes sharing gruesome videos and images of suicides, beheadings, accidents, and the like."[12] His comments about school shootings earned him the nickname 'Yubo's school shooter'" on that social media platform. All of this activity took place before the shooter bought his gun, legally, when he turned 18. *See id.* Social media can also demonstrate "several [other] sound bases . . . for denying" a "request to possess a firearm" that the Second Circuit has already identified, such as "threats to harm others" and "repeatedly reckless conduct with a weapon while intoxicated." *Libertarian Party*, 970 F.3d at 126. Because these are plainly constitutional applications of the requirement, it should be upheld. *Salerno*, 481 U.S. at 745.

Nor is there any basis for an argument that the social media disclosure provision violates the First Amendment since it passes the applicable intermediate scrutiny test. It is content neutral in that it simply requires disclosure of a list of accounts, regardless of their substance. *See Doe v.*

---

[12] See Texas House of Representatives Investigative Committee on the Robb Elementary Shooting, Interim report 2022, available at, https://house.texas.gov/media/pdf/committees/reports/87interim/Robb-Elementary-Investigative-Committee-Report.pdf.

25

*Harris*, 772 F.3d 563, 567 (9th Cir. 2014) (finding California law requiring sex offenders to disclose a list of internet identifiers to be content neutral because it did not prohibit the use of "particular websites, or any particular type of communication"). Under intermediate scrutiny, the challenged measure must be "narrowly tailored to serve a significant governmental interest," but need not be "'the least restrictive or least intrusive means of achieving the stated governmental interest.'" *Mastrovincenzo v. City of New York*, 435 F.3d 78, 98 (2d Cir. 2006) (cleaned up). New York certainly has a "substantial, indeed compelling" interest in the reduction of gun violence, *Libertarian Party*, 970 F.3d at 128, so the outcome turns on the narrow tailoring prong, which "is satisfied so long as the content-neutral regulation promotes a substantial governmental interest that *would be achieved less effectively absent the regulation.*" *Mastrovincenzo*, 435 F.3d at 98 (cleaned up, emphasis in the original). The social media disclosure provision is narrowly tailored. It does not actually restrict speech, only requiring disclosure of a list of accounts, and the disclosure requirement is closely circumscribed: it is 1) only triggered by voluntary behavior—a decision to apply for a gun license; 2) only used to determine whether the applicant presents a significant danger of violence; and 3) only requires "a list of former and current social media accounts of the applicant from the past three years." Penal Law § 400.00(1)(o)(iv). And this information directly from the applicant can be used "to confirm" (or, in some cases, contradict) the information furnished by external sources. *Id.* § 400.00(1)(o)(iv).

**Allowing Licensing Officers to Request Other Information.** Plaintiffs state that the provision in Penal Law § 400.00(1)(o)(v) allowing a licensing officer to request "such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application" is unconstitutional because it allows for "open-ended discretion". ECF No. 27-14 at 15.  But this facial challenge could succeed only if there were *no* further

26

information it would be constitutional to request. *See Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 184 (2d Cir. 2017). And that is obviously not the case, as other "shall-issue" states approved of in the *Bruen* opinion require the submission of information that New York does not, or likewise permit licensing officials to request additional information that is reasonably necessary. *See, e.g.,* Ala. Stat. § 13A-11-75(d)(2) ("If the sheriff cannot determine whether [an enumerated factor] applies to the applicant, the sheriff may request additional information from the applicant.").

### E. Plaintiffs Cannot Succeed on a Facial Challenge to the Requirement That License Applications Be Ruled On Within Six Months of the Date of Presentment

Plaintiffs have not demonstrated any clear likelihood of success on the merits as to their challenge to Penal Law § 400.00(4-a), which provides that "[e]xcept upon written notice to the applicant specifically stating the reasons for any delay, in each case the licensing officer shall act upon any application for a license pursuant to this section within six months of the date of presentment of such an application to the appropriate authority." As a threshold matter, no Plaintiff asserts any injury-in-fact traceable to this statute – if anything, Plaintiffs' purported injuries seem to stem from an assertion that Suffolk County has *not* followed it. *See, e.g.,* AC, ¶ 217 (noting that Plaintiff McGregor had previously sued the County "because more than 6 months had elapsed since the filing of his application").[13] But even if the Plaintiffs had carried their burden to show standing as to this provision, there is no merit to their argument that a six-month limit for adjudicating licensing applications is facially unconstitutional.

Plaintiffs' moving papers devote only three sentences and four lines of text to this challenge, asserting that "[e]ven the 6-month window . . . is too long to wait" and that the process

---

[13] The Superintendent has no knowledge of Suffolk County's procedures and takes no position on whether they comply with state or federal law.

27

should only take "a matter of minutes" to run a "federal criminal background check." ECF No. 27-14 at 11. Plaintiffs do not attempt to demonstrate why the Second Amendment's plain text would provide a right to obtain a firearm instantly. Certainly nothing in *Bruen* supports such a proposition – to the contrary, the *Bruen* majority only contemplated "constitutional challenges . . . where, for example, lengthy wait times in processing license applications . . . deny ordinary citizens their right to public carry." 142 S. Ct. at 2138 n.9. Nor do any of the historical sources discussed above include any requirement that the government adjudicate a person's loyalty or dangerousness within a specified period of time; by providing a maximum period in which applications must be adjudicated, New York law provides *more* guarantee of a speedy process than the laws applicable in the 18th or 19th Centuries. *See, e.g.,* 1881 Ordinances of the Mayor, Aldermen and Commonality of the City of New York art. XXVII, § 265, at 214-15, HD Exs. 18 & 19 (allowing for persons to apply for a pistol license at the local police precinct, where the local officer "if satisfied that the applicant is a proper and law-abiding person, shall give such person a recommendation to the superintendent of police, . . who shall issue a permit to the said person," with no time limit for how long the process could take.).

Although the Superintendent is not aware of any other cases raising constitutional challenges to a maximum processing time for a handgun license, federal cases in other contexts indicate that there is nothing unreasonable about a processing period that sets a six-month maximum to adjudicate an application. *See, e.g., INS v. Miranda*, 459 U.S. 14, 19 (1982) (18-month period to review immigration application was not "unwarranted" as "the number of applications received by the [agency]and the need to investigate their validity may make it difficult for the agency to process an application as promptly as may be desirable."). Moreover, in most of New York, the licensing officer is a local Supreme or County Court judge, *see* N.Y. Penal Law §

265.00(10), whose dockets may be as busy as a federal court's, but without the same resources, clerks, or support staff. Notably, Congress has determined that six months is a reasonable period for federal judges to adjudicate motions, many of which involve constitutional issues no less fundamental than issuance of a gun license, and the tools involved do not include a statutory mandate like Penal Law § 400.00(4-a), but rather an informal incentive in the form of the "six-month list." *See* 28 U.S.C. § 476. Simply put, there is nothing to indicate that a six-month statutory maximum for processing gun permit applications is unreasonable or unwarranted, let alone facially unconstitutional.

### F. Applying A Criminal Penalty to Persons Who Carry Outside of License Restrictions is Constitutional

Plaintiffs challenge Penal Law § 400.00(15) as unconstitutional to the extent that it applies to a person who carries outside of his license restriction, but this claim fails as well. *Bruen* did not upend New York's licensing provisions; it held only that the "proper cause" standard violated the constitutional rights of individuals who did not meet that standard. 142 S. Ct. at 2126. "[T]he Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense." *Id.* at 2121 (Kavanaugh, J., concurring). If the State is allowed to impose licensing requirements for carrying firearms, it also must have a corresponding enforcement mechanism. And since the "right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose" *Heller,* 554 U.S. at 626, an individual who knowingly violates his license restriction is properly subject to a misdemeanor penalty. By his conduct, that individual is demonstrating that he is not the "responsible, law-abiding" citizen to whom the Second Amendment applies. *Bruen*, 142 S. Ct. at 2122, 2125, 2131.

29

**POINT IV:   THE EQUITIES AND THE PUBLIC INTEREST FAVOR ALLOWING ENFORCEMENT OF THE CCIA**

In addressing the equities, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Here, Plaintiffs have no plausible claim of injury related to the licensing requirements or to carrying outside of a license restriction because of their standing deficiencies and the lack of merit of their constitutional claims. Conversely, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury,' particularly where there would be 'an ongoing and concrete harm to . . . public safety interests." *Maryland v. King*, 567 U.S. 1301, 1303 (2012). Without the challenged good moral character and disclosure requirements, more guns may end up in the hands of persons who should not have them, and without the training requirements, guns may end up in the hands of persons who are not able to wield them responsibly. These significant public safety concerns weigh strongly against issuing an injunction.

**CONCLUSION**

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction against defendants' enforcement of the CCIA should be denied.

Dated:  Hauppauge, New York
        January 20, 2023

LETITIA JAMES
Attorney General for the State of New York
Attorney for Superintendent Nigrelli

By: *Patricia M. Hingerton*
    Patricia M. Hingerton
    Assistant Attorney General
    300 Motor Parkway, Suite 230
    Hauppauge, New York 11788
    Patricia.Hingerton@ag.ny.gov
    (631) 231-2424