UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ZACHARY GIAMBALVO, JOHN MOUGIOS,
SHANE MASHKOW, KEVIN MCLAUGHLIN,
MICHAEL MCGREGOR, FRANK MELLONI,
and RENAISSANCE FIREARMS INSTRUCTION,
INC., and all similarly situated individuals,

                Plaintiffs,                22 Civ. 04778 (GRB)(ST)

      -against-

SUFFOLK COUNTY, New York,
Police Commissioner RODNEY HARRISON,
in his Official Capacity, MICHAEL
KOMOROWSKI, Individually, ERIC BOWEN,
Individually, WILLIAM SCRIMA, Individually,
WILLIAM WALSH, Individually, THOMAS
CARPENTER, Individually, JOHN DOES
1-5, Individually and JANE DOES 1-5,
Individually, Acting Superintendent of the
New York State Police STEVEN NIGRELLI,
in his official capacity,
                Defendants.
-----------------------------------------------------------------x

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT

# OF PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION

**THE BELLANTONI LAW FIRM, PLLC**
*Attorneys for Plaintiffs*
**2 Overhill Road, Suite 400**
**Scarsdale, New York 10583**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ...................................................................................................... i

I. SCPD's 'LENGTHY WAIT TIMES' VIOLATE THE SECOND AMENDMENT ................. 1

II. PLAINTIFFS' CONDUCT IS "PRESUMPTIVELY PROTECTED" ..................................... 2

III. PENAL LAW 265.20 EXCEPTION FOR 'LIVE FIRE' TRAINING STANDS ALONE ...... 2

IV. SECOND AMENDMENT VIOLATIONS CONSTITUTE IRREPARABLE HARM .......... 3

V. THE PUBLIC INTEREST AND BALANCING FAVOR AN INJUNCTION ........................ 4

VI. PLAINTIFFS HAVE STANDING TO CONTEST SCPD'S ARREST POLICY ................. 7

      A. Individual Standing .................................................................................................. 7

      B. Third Party Standing ................................................................................................ 8

VII. ANTONYUK HAS NO BEARING ON SCPD'S LICENSING POLICIES ......................... 9

VIII. SUPREME COURT JURISPRUDENCE LOOKS TO 1791 ............................................... 9

IX. THE STATE FAILED TO IDENTIFY ANY HISTORICAL TRADITION ....................... 12

      A. Moral Character Requirement of 400.00(1)(b) ...................................................... 12

      B. In Person Interview Requirement of 400.00(1)(o) ................................................. 13

      C. Character References - 400.00(1)(o) ...................................................................... 13

      D. Disclosure of Cohabitants - 400.00(1)(o) .............................................................. 13

      E. Training Requirement - 400.00(1)(o) ..................................................................... 14

      F. Social Media - 400.00(1)(o) ................................................................................... 14

      G. "Other Information" - 400.00(1)(o) ....................................................................... 15

X. FACIAL CHALLENGE TO STATE 6-MONTH RULE ..................................................... 15

XI. PLAINTIFFS' DELAY IN CHALLENGING THE CCIA ................................................. 16

**TABLE OF CONTENTS**

Page(s)

XII. PLAINTIFFS SUFFER IMMINENT HARM FROM THE CCIA ....................................... 16

XIII. PENAL LAW 400.00(15) IS A CRIMINAL STATUTE, NOT MERELY A
LICENSING REGULATION .................................................................................................... 17

CONCLUSION ............................................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agudath Israel of Am. v. Cuomo*,
  983 F.3d 620 (2d Cir. 2020) ........................................................................ 3

*Anderson Grp. I*,
  2011 WL 2472996 ......................................................................................... 7

*Anderson Grp., LLC v. City of Saratoga Springs*,
  805 F.3d 34 (2d Cir. 2015) ......................................................................... 7

*Barbecho v. Decker*,
  2020 WL 1876328 (S.D.N.Y. Apr. 15, 2020) ......................................... 4

*Benton v. Maryland*,
  395 U.S. 784 (1969) .................................................................................. 10

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940) .................................................................................. 11

*Carey v. Population Servs., Int'l*,
  431 U.S. 678 (1977) .................................................................................... 8

*Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*,
  356 F.3d 226 (2d Cir. 2004) ...................................................................... 3

*Coronel v. Decker*,
  449 F. Supp. 3d 274 (S.D.N.Y. 2020) .................................................... 4

*Craig v. Boren*,
  429 U.S. 190 (1976) .................................................................................... 8

*Crawford v. Washington*,
  541 U.S. 36 (2004) ...................................................................................... 9

*Dark Storm Indus. LLC v. Cuomo*,
  471 F. Supp. 3d 482 (N.D.N.Y. 2020) .................................................... 8

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ...........................................................................Passim

*Doe v. University of Connecticut*,
  2020 WL 406356 (D. Conn. Jan. 23, 2020) ........................................... 4

**Cases**

*Drummond v. Twp.*,
    361 F. Supp. 3d 466 (W.D. Pa. 2019) ................................................................... 8

*Duncan v. Louisiana*,
    391 U.S. 145 (1968) ................................................................................................ 10

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ................................................................................. 8

*Forty-Second St. Co. v. Koch*,
    613 F. Supp. 1416 (S.D.N.Y. 1985) ...................................................................... 9

*Fulton v. City of Philadelphia*,
    141 S.Ct. 1868 (2021) ............................................................................................ 10

*G & V Lounge, Inc. v. Michigan Liquor Control Com'n*,
    23 F.3d 1071 (6th Cir. 1994) ................................................................................. 5

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006) ................................................................................................ 5

*Grimmett v. Freeman*, No.,
    2022 WL 3696689 (4th Cir. Aug. 25, 2022) ....................................................... 4

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) ............................................................................. 4

*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*,
    565 U.S. 171 (2012) ................................................................................................ 10

*In re Oliver*,
    333 U.S. 257 (1948) ................................................................................................ 10

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996) .................................................................................... 3

*Klopfer v. North Carolina*,
    386 U.S. 213 (1967) ................................................................................................ 10

# TABLE OF AUTHORITIES (con't)

**Page(s)**

**Cases**

*Levin v. Frank,*
2019 WL 1754216 (N.D.N.Y. Apr. 19, 2019) ............................................ 7

*Lynch v. Donnelly,*
465 U.S. 668 (1984) .................................................................. 10

*Martinez-Brooks v. Easter,*
459 F. Supp. 3d 411 (D. Conn. 2020) ................................................. 5

*McDonald v. City of Chicago, Ill.,*
561 U.S. 742 (2010) .............................................................. 4, 5

*Near v. Minnesota,*
283 U.S. 697 (1931) ................................................................ 10

*Nevada Comm'n on Ethics v. Carrigan,*
564 U.S. 117 (2011) ................................................................ 10

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
142 S. Ct. 2111 (2022) ........................................................ Passim

*Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.,*
337 F. Supp. 3d 308 (S.D.N.Y. 2018) ................................................ 4

*Powell v. Alabama,*
287 U.S. 45 (1932) ................................................................. 10

*Ramos v. Louisiana,*
140 S.Ct. 1390 (2020) .............................................................. 10

*Range v. Att'y Gen. United States,*
53 F.4th 262 (3d Cir. 2022) ........................................................ 13

*Reynolds v. United States,*
98 U.S. 145 (1878) ................................................................. 10

*Rhode Island v. Massachusetts,*
37 U.S. (12 Pet.) 657 (1838) ........................................................ 9

*Sajous v. Decker,*
2018 WL 2357266 (S.D.N.Y. May 23, 2018) ........................................... 4

# TABLE OF AUTHORITIES (con't)

**Page(s)**

**Cases**

*South Carolina v. United States*,
   199 U.S. 437 (1905) ............................................................. 9

*Statharos v. New York City Taxi & Limousine Comm'n*,
   198 F.3d 317 (2d Cir. 1999) ............................................... 3

*Teixeira v. Cty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ............................................. 8

*Timbs v. Indiana*,
   139 S.Ct. 682 (2019) ........................................................ 10

*U.S. Food & Drug Admin.*,
   710 F.3d 71 (2d Cir. 2013) ................................................. 7

*Valenzuela Arias v. Decker*,
   2020 WL 1847986 (S.D.N.Y. Apr. 10, 2020) ..................... 3

*Vill. of Arlington Heights*,
   429 U.S. 252 (1977) ........................................................... 7

*Virginia v. Moore*,
   553 U.S. 164 (2008) ......................................................... 10

*Washington v. Texas*,
   388 U.S. 14 (1967) ........................................................... 10

*We The Patriots USA, Inc. v. Hochul*,
   17 F.4th 266 (2d Cir.) ........................................................ 5

*Wilson v. Arkansas*,
   514 U.S. 927 (1995) ......................................................... 10

*Wyoming v. Houghton*,
   526 U.S. 295 (1999) ......................................................... 10

**Statutes**

18 U.S.C. 922(g) ................................................................ 13
28 U.S.C. 922(g) ................................................................ 13

# I. SCPD's 'LENGTHY WAIT TIMES' VIOLATE THE SECOND AMENDMENT[1]

The *Bruen* Court conditioned the continuation of 'may issue' licensing schemes, like New York's, on the implementation of objective criteria[2]; yet, New York State's licensing scheme remains a 'may issue' platform. The Court only sanctioned the continuation of 'shall issue' regimes because "they do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry."[3]

Even so, the Court did "not rule out constitutional challenges to shall-issue regimes" "because any permitting scheme can be put toward abusive ends" "where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, at 2138.

Plaintiffs produced recorded admissions from SCPD and Plaintiffs' Declarations establishing that SCPD's licensing process takes 2-3 years – facts unchallenged by SCPD. The state's 6-month statutory timeframe, implemented within SCPD's 2-3 year process, is also unconstitutionally lengthy. [Penal Law § 400.00(4-a)]. As discussed in the Reply to the State below, where no wait time to possess and carry Arms existed in the Founding Era, delays exceeding **30 days** violate the Second Amendment.[4]

By refusing to accept the State PPB-3 for filing upon presentation, delaying fingerprinting, interviews, and photographs for 1½-2 years, SCPD deliberately delays the commencement of the State's 6-month clock: "the NYS Application and fingerprints are completed (the date of the

---

[1] Plaintiffs' Reply addresses the responses from SCPD and the State and incorporates by reference herein all arguments as and against both sets of defendants.
[2] Only permitting "the 6 States including New York potentially affected by today's decision [to] continue to require licenses for carrying handguns for self-defense **so long as those States employ objective licensing requirements like those used by the 43 shall-issue States.**" *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2162 (2022).
[3] *Bruen*, at 2138 (citing *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (internal quotation marks omitted).
[4] SCPD inaccurately represents that Plaintiffs "require decisions…within "3 months." [County MOL at p. 2; 3 n.4].

interview), is the date by which the six (6) month time frame as set forth in NYS Penal Law § 400.00(4-a) commences." Aff. of Lt. Michael Komorowski at Bellantoni Reply Dec. Ex. 1, ¶¶5-8. Thus, SCPD *is* enforcing the state's 6-month requirement – after imposing its own 1½ -2 year wait.

## II.  PLAINTIFFS' CONDUCT IS "PRESUMPTIVELY PROTECTED"

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, at 2126.

This is not a case where the Court is faced with dramatic technological changes or unprecedented societal concerns, where the Defendants would be burdened with identifying an historical analogue. The conduct being regulated by the State falls within the basic and naked text – keeping and bearing arms. Plaintiffs cannot keep (purchase or possess) or bear (carry concealed) because of Defendants' enforcement of the challenged firearm regulations.

Because the plain text of the Second Amendment "presumptively guarantees"[5] and "protects…carrying handguns publicly for self-defense"[6] Plaintiffs have met their burden under the *Bruen* test. Defendants' urgings to disregard the *Bruen* test must be flatly rejected.[7]

## III. PENAL LAW 265.20 EXCEPTION FOR 'LIVE FIRE' TRAINING STANDS ALONE

Penal Law section 265.20 (3-a), enacted through the CCIA, exempts unlicensed individuals who engage in live fire training to obtain a concealed carry license from criminal penalties.  Under

---

[5] *Bruen*, at 2135.
[6] *Bruen*, at 2134.
[7] The State, ignoring *Bruen*, improperly attempts to integrate the language of its regulations into the plain text of the Second Amendment, which cannot be countenanced and perverts the Right itself. [State MOL at p. 13, ¶ 1]. The *Oregon Firearms* case is inapposite to the extent that the word 'magazines' does not appear in the plain text, but 'keep and bear' is plain and *well-established* by *Heller, McDonald, Caetano,* and *Bruen*.

SCPD policy, however, any unlicensed person who engages in live fire training to satisfy the CCIA requirements will be arrested[8] - a fact left uncontested by the County.

SCPD does not deny its "arrest policy". Rather, it erroneously points to a separate (and preexisting) exemption (§ 265.20 (7-b)) to justify its arrest policy, but there is no correlation between the two, no language tying the implementation or validity of (3-a) to section (7-b), and no qualification that the provisions of section 400.00(3)(b) apply to (3-a).[9] Section (3-a) allows individuals (no requirement that an application be pending) to lawfully take the live fire training required by § 400.00, whereas *while they are undergoing such training and are supervised by a duly authorized instructor.* Section (7-b), however, allows "pre-license possession [of a handgun]" by a person *who has applied for a license and pre-license possession*, which generally applies to possession of a handgun for employment purposes. Plaintiffs are not seeking, and did not apply for, "pre-license possession" of a handgun under (7-b).

## IV. SECOND AMENDMENT VIOLATIONS CONSTITUTE IRREPARABLE HARM

In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) (A "presumption of irreparable injury ... flows from a violation of constitutional rights."); *Valenzuela Arias v. Decker*, No. 20 CIV. 2802 (AT), 2020 WL 1847986, at *5 (S.D.N.Y. Apr. 10, 2020) citing, *Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) (no separate showing of irreparable harm is necessary); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[I]t is the

---

[8] Plaintiffs' MOL at 6-8; Melloni Dec.
[9] See, Penal Law section 265.20(3-a). Had the Legislature intended such reliance or a conditional application of (3-a), it would have included it in the plain language of the statute, which it did not. Each separate exemption stands on its own under 265.20. Moreover, section (3-a) was passed simultaneously with the CCIA training requirements to allow applicants to fulfill the training requirements before and/or during the application process – not, as the SCPD policy would require, to obtain a premises license first, then undergo the CCW training, and then reapply for a concealed carry license upon completion of the CCIA training.

alleged violation of a constitutional right that triggers a finding of irreparable harm."); accord, *Grimmett v. Freeman*, No. 22-1844, 2022 WL 3696689, at *2 (4th Cir. Aug. 25, 2022).

Because the constitutional right to keep and bear arms is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees"[10], the loss of Second Amendment freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury."[11] Plaintiffs have suffered, and continue to suffer, an injury-in-fact.

SCPD policy wrongfully prevents the exercise of conduct presumptively protected by the Second and Fourteenth Amendments – possessing and/or carrying handguns – by implementing a licensing process that spans 2-3 years. Plaintiffs are suffering the loss of that Right and will continue to suffer such loss in the absence of an injunction. See, Giambalvo Dec. at ¶¶ 6-10; Mashkow Dec. at ¶¶ 9-15; Mougios Dec. at ¶¶ 8-11; McLaughlin Dec. at ¶¶ 4-5.

## V. THE PUBLIC INTEREST AND BALANCING FAVOR AN INJUNCTION

"Where the Government is the opposing party, the final two factors in the temporary restraining order analysis—the balance of the equities and the public interest—merge." *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018).

"The public interest is best served by ensuring the constitutional rights of persons within the United States are upheld. *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020) quoting, *Sajous v. Decker*, No. 18-cv-2447 (AJN), 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018); see also, *Doe v. University of Connecticut*, 2020 WL 406356, at *6 (D. Conn. Jan. 23, 2020) (noting the "public interest in avoiding violations of constitutional rights"); *Barbecho v. Decker*,

---

[10] *Bruen*, at 2156 quoting, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780 (2010) (plurality opinion).
[11] C.f., *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), aff'd sub nom. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

2020 WL 1876328, at *7 (S.D.N.Y. Apr. 15, 2020); accord, *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 448 (D. Conn. 2020); *G & V Lounge, Inc. v. Michigan Liquor Control Com'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

And, because the likelihood that Plaintiffs will succeed on their Second Amendment claims is substantially high, the public interest would be served by protecting their constitutional rights.

As for balancing the equities, SCPD leans entirely on the "public safety" justifications *thrice* rejected by the Supreme Court. As "Members of the Court have already explained, the right to keep and bear arms ... is not the only constitutional right that has controversial public safety implications." *Bruen*, at 2126, quoting, *McDonald* at 783; *Heller*, at 634 (rejecting a judge-empowering "interest-balancing inquiry" for Second Amendment challenges).

The State presses fear and public safety concerns [State MOL at p. 29] – also rejected by *Heller* and *Bruen* and patently improper for this Court's consideration.

The burdens at the preliminary injunction stage track the burdens at trial. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 (2d Cir.), opinion clarified, 17 F.4th 368 (2d Cir. 2021), and cert. denied sub nom. *Dr. A. v. Hochul*, 213 L. Ed. 2d 1126, 142 S. Ct. 2569 (2022) quoting, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

*Heller* and *Bruen* rejected means-end scrutiny and interest balancing tests in Second Amendment challenges. For the Court to engage in an interest balancing test that permits the State to press the same public safety justifications applied in this Circuit's 2-step analysis that was explicitly rejected in *Bruen* – flouts the Supreme Court's patent rejection of the same. Whether at the preliminary injunction stage or motion to dismiss[12], interest balancing is improper in the

---

[12] As in *Heller* and *Bruen*.

Second Amendment context. This is so because 'interest balancing' was conducted before the ratification.

> "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."

*Heller,* at 634–35.

Under *Bruen*, the State cannot advance public safety, means-end arguments at the trial stage and, therefore, cannot properly advance such arguments at the preliminary injunction stage where the same burdens apply.

The *Bruen* Court reconfirmed that that the "Second Amendment is the very product of an interest balancing by the people" and it "surely elevates *above all other interests* the right of law-abiding, responsible citizens to use arms" for self-defense. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022) quoting, *D.C. v. Heller*, 554 U.S. 570, 635(2008). "It is this *balance*—struck by the traditions of the American people—that demands our *unqualified deference*." The *Bruen* Court rejected means-end scrutiny and public safety justifications in Second Amendment challenges as "inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Bruen*, at 2129.[13] Any 'hardship' faced by SCPD cannot outweigh the "presumptively protected"[14] and "guaranteed individual right"[15] to "keep and bear arms."

---

[13] The *Bruen* test applies to all Second Amendment challenges; the Court made no distinction between motions to dismiss, preliminary injunctions, summary judgment, or otherwise.

[14]*Bruen*, at 2126 ("In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution **presumptively protects** that conduct.").

[15]*Heller*, at 592 ("Putting all of these textual elements together, we find that they **guarantee** the **individual right** to possess and carry weapons in case of confrontation.").

## VI. PLAINTIFFS HAVE STANDING TO CONTEST SCPD'S ARREST POLICY

### A. Individual Standing

To establish individual standing, under Article III, a plaintiff must demonstrate that it has (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.

The essence of the standing question, in its constitutional dimension, is whether the plaintiff has such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 45 (2d Cir. 2015) quoting, *Vill. of Arlington Heights*, 429 U.S. at 260–61. See also, *Levin v. Frank*, No. 318CV1292MADDEP, 2019 WL 1754216, at *3 (N.D.N.Y. Apr. 19, 2019), aff'd, 803 F. App'x 562 (2d Cir. 2020) (finding standing where the alleged financial harms concrete and particularized, even if their actual value was subject to considerable infirmities, were caused by the defendants' conduct, and could be redressed by an order of the court); *Anderson Grp. I*, 2011 WL 2472996, at *3 (finding financial harms to be injuries-in-fact even though the actual value of the losses may be "subject to considerable infirmities"); *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) ("Even a small financial loss is an injury for purposes of Article III standing").

The Melloni Declaration contains **uncontested admissions** from SCPD Lt. Michael Komorowski that SCPD will "arrest anybody who handles a pistol or revolver without a New York State pistol permit" and that "SCPD is not honoring the exemption outlined in Penal Law § 265.20(3-a), which clearly allows for training before a permit is issued, as it is part of the application process." [ECF Doc. 27-13, ¶¶ 12-13].

RFI has suffered actual economic harm from the forced cancellation of students who were registered to engage in live fire training as part of the 18-hour CCIA CCW training course as a direct result of SCPD's arrest policy; Giambalvo has a present intention to take the training class and faces imminent arrest when he does. Also, no Plaintiff can be found 'eligible' for a concealed carry license until the 18-hour course has been completed. § 400.00(1)(o).

## B. Third Party Standing

"Vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Dark Storm Indus. LLC v. Cuomo*, 471 F. Supp. 3d 482, 493 (N.D.N.Y. 2020) (internal brackets omitted) quoting, *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017); *Craig v. Boren*, 429 U.S. 190, 195 (1976)). In *Dark Storm,* the plaintiff gun store asserted that it ceased doing business with the general public in response to the state's Executive Orders and that the Orders were a detriment to them and others in the exercise of a constitutional right. The Northern District found, "as the ... operator of a gun store [Dark Storm] ... has derivative standing to assert the subsidiary right to acquire arms on behalf of [its actual and] potential customers." *Id.* citing, *Teixeira*, 873 F.3d at 678; Carey v. Population Servs., Int'l, 431 U.S. 678, 683 (1977)); *Ezell v. City of Chicago*, 651 F.3d 684, 693 (7th Cir. 2011) (supplier of firing-range facilities had standing to challenge, on behalf of potential customers, Chicago ordinance banning firing ranges); *Drummond v. Twp.*, 361 F. Supp. 3d 466, 480 (W.D. Pa.) ("Plaintiff[s] ..., as would-be operators of a commercial shooting range, have standing to sue on behalf of their potential customers."), aff'd in part, vacated in part on other grounds, remanded sub nom. *Drummond v. Twp. of Robinson*, 784 F. App'x 82 (3d Cir. 2019); cf. *Forty-Second St. Co. v. Koch*, 613 F. Supp.

1416, 1422 (S.D.N.Y. 1985) (rejecting defendants' argument that movie theater companies did not have standing to assert the rights of their customers).

RFI, Inc. and Mr. Melloni also have derivative standing to assert Second and Fourteenth Amendment claims against SCPD as vendors resisting Suffolk County's efforts to restrict their operations by acting as advocates of the rights of their customers who seek access to their services.

## VII. *ANTONYUK* HAS NO BEARING ON SCPD'S LICENSING POLICIES

While Plaintiffs object to a stay of this application pending the *Antonyuk* decision, as the cases involve separate plaintiffs and issues, *Antonyuk* unquestionably has no bearing on SCPD's licensing policies and practices and SCPD's "arrest policy' for live fire training.

## VIII. SUPREME COURT JURISPRUDENCE LOOKS TO 1791

"Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the Founding Period, not 1868. The conception that the Constitution has a fixed, original meaning goes far back in constitutional jurisprudence.

> When interpreting the Free Speech and Press Clauses, we must be guided by their original meaning, for "[t]he Constitution is a written instrument. As such its meaning does not alter. *That which it meant when adopted, it means now*." *South Carolina v. United States*, 199 U.S. 437, 448 (1905). We have long recognized that the meaning of the Constitution "must necessarily depend on the words of the constitution [and] the *meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions ... in the several states.*" *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 721 (1838)."[16]

Recognizing that "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," the *Bruen* Court pointed to *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth

---

[16] Smith, Mark W., "Not All History Is Created Equal," October 1, 2022 [Bellantoni Reply Dec. at Ex. 2, p. 9].

Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment). Bruen, at 2137-38 (emphasis added). Justice Thomas may have acknowledged an "ongoing scholarly debate" concerning 1868, but the *Bruen* Court adhered to Supreme Court jurisprudence, which "looks to the Founding era as the period of sole or primary relevance." See, Ex. 2.

A few of the "numerous cases involving all of the amendments in the Bill of Rights that have been incorporated" in which the Founding Period was the temporal focal point, not when the amendments were incorporated into the Fourteenth Amendment in 1868. [Ex. 2 at 17-30 discussing First Amendment: *Near v. Minnesota*, 283 U.S. 697 (1931), *Reynolds v. United States*, 98 U.S. 145 (1878), *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171 (2012), *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021), *Lynch v. Donnelly*, 465 U.S. 668 (1984); Fourth Amendment: *Wyoming v. Houghton*, 526 U.S. 295 (1999), Wilson v. Arkansas, 514 U.S. 927 (1995); Fifth Amendment: *Benton v. Maryland*, 395 U.S. 784 (1969), *Gamble v. United States*, 139 S.Ct. 1960 (2019); Sixth Amendment: *Ramos v. Louisiana*,140 S.Ct. 1390 (2020), *Powell v. Alabama*, 287 U.S. 45 (1932), *Klopfer v. North Carolina*, 386 U.S. 213 (1967), *In re Oliver*, 333 U.S. 257 (1948), *Duncan v. Louisiana*, 391 U.S. 145 (1968), *Washington v. Texas*, 388 U.S. 14 (1967); Eighth Amendment: *Timbs v. Indiana*, 139 S.Ct. 682 (2019).

Restrictions on the right to keep and bear arms did not begin to surface until after the ratification of the Bill of Rights in 1791 – the relevant historical time period according for interpreting the provisions of the Bill of Rights according to Supreme Court jurisprudence; and, even then, the restrictions only pertained to the carriage of handguns.

Any historical 'evidence' that (i) contradicts the plain text of the Second Amendment and/or (ii) post-dates the ratification of the Bill of Rights and conflicts with the plain text of the Second Amendment is to be rejected – because "the text controls." *Bruen*, at 2137.

In attempting to justify its regulations, as is its burden, the State spills much ink on irrelevant periods in history. English statutes and a few regulations from the 1600s are not traditions that were "commonly understood at the time of the Second Amendment's ratification in 1791.[17] [MOL at pp. 14-15]. To the extent that certain colonies in and around 1776 required post-Revolutionary War 'loyalty oaths', they are no analogue to subjective 'moral character judgments.' The 'moral character' factor is an improper discretionary determination based on subjective opinion. *Bruen* flatly rejected subjective licensing regimes that "grant[] licensing officials discretion to deny licenses based on a perceived lack of need or suitability" or require the "appraisal of facts, the exercise of judgment, and the formation of an opinion - features that typify proper-cause standards like New York's." *Bruen*, at 2123, 2138 (quoting, *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940). New York remains a "may issue" licensing state and, like the "proper cause" standard, New York's "moral character" requirement requires licensing officers who have "broad discretion" to make judgment calls, appraise facts, and form opinions to determine whether an applicant is "worthy" of exercising a presumptively protected right.[18]

---

[17] Licensing-related anecdotes from 14th Century England are irrelevant. [State MOL at p. 17, n. 6]. *Bruen*, at 2136 (refusing to rely on an 'ancient' practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies.") (internal quotation marks and citation omitted).
[18] Similarly, where grounds may have existed to remove an individual from militia service, the State presents no evidence that his right to possess and carry firearms was also terminated. See, MOL at p. 16. And, as *Heller* made clear, the Second Amendment right protects the *individual* right to keep and bear arms; it is not tied to militia service. *D.C. v. Heller,* 554 U.S. 570, 592 (2008) ("Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation. This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'").

The State's foray into the mid-late 1800s and 1900s also misses the historical mark. Again, the Supreme Court has always looked to the ratification in 1791, not the adoption of the Fourteenth Amendment in 1868 - a time period the *Bruen* Court found unreliable for determining the *original meaning* of the Bill of Rights. The Bill of Rights does not have separate meanings for the state and federal governments.[19]

## IX.  THE STATE FAILED TO IDENTIFY ANY HISTORICAL TRADITION

Under *Bruen*, the State must demonstrate that the regulations are "consistent with the Nation's historical tradition of firearm regulation" [*Bruen*, at 2129–30], which it failed to do.

### A.  Moral Character Requirement of 400.00(1)(b)

The State has identified no Founding Era historical tradition placing discretionary authority in a government official to make a subjective determination of one's moral character, and judgment, temperament before the individual could "be entrusted with a weapon" and exercise the right to keep and bear arms. Penal Law §400.0(1)(b) conflicts with the plain text of the Second Amendment – that the right to keep and bear arms "shall not be infringed." Subjective and discretionary factors requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion…like New York's [proper-cause standards]" are unconstitutional. *Bruen*, at 2138.

The State has identified no Founding Era historical analogue. A determination of 'suitability' can be accomplished objectively through a background check to identify statutory

---

[19] The following State exhibits fall outside of the Founding Era timeframe and must be disregarded: Exs. 1, 3, 4, 5 (1600s); Exs. 17, 18, 19, 20, 22, 23, 24, 25, 30 (mid-late 1800s); and Exs. 26, 27, 28 (1900s). The following regulations fall within the Founding Era time period or immediately prior thereto and relate to disarmament for refusing to swear an oath of allegiance to America (Exs. 6, 7, 8, 9, 10, 11); mandatory state or federal militia service (Exs. 12, 13, 14, 15, 16, 31, 32, 33). Exhibit 2 is a Pennsylvania statute prohibiting the sale of weapons and ammunition to Native Americans, which alone does not establish a National 'tradition'; and Exs. 5, 21 are to be disregarded as they are Statutes from England, not America.

disqualifications – like those identified in 28 U.S.C. 922(g) - objective criteria to prohibit firearm possession by disqualified people. See, e.g., 18 U.S.C. 922(g).[20]

### B.  In Person Interview Requirement of 400.00(1)(o)

Likewise, in person interviews to assess one's 'veracity'[21] or other subjective factors fare no better. The State points to no Founding Era tradition requiring an interview with a government official as a condition precedent to exercise of one's guaranteed right to keep and bear arms for self-defense. And the loyalty oath of 1776 and 1777 required in-person oaths to be made, the refusal of which led to the termination of *all rights*, not just firearm rights.[22] [State Ex. 7]. Moreover, the *Bruen* test is not whether Plaintiffs are "unduly burdened" by having to submit to an interview[23]; the State must identify an historical analogue, which it cannot.

### C.  Character References - 400.00(1)(o)

The State has identified *no regulations* from the Founding Era requiring character references be provided as a condition to keeping and bearing weapons for self-defense.

### D.  Disclosure of Cohabitants - 400.00(1)(o)

The State again suggests the wrong test – whether or not Plaintiffs are "unduly burdened" by having to disclose their cohabitants is not a proper inquiry, nor must the violation of Plaintiffs' rights rise to the level of being a 'total ban' to be actionable[24] [25] - and failed to identify *any*

---

[20] The State's reference to *Range v. Att'y Gen. United States*, 53 F.4th 262 (3d Cir. 2022) should be disregarded as the opinion was vacated sub nom. by *Range v. Att'y Gen. United States of Am.*, 56 F.4th 992 (3d Cir. 2023) pending rehearing en banc. In any event, unlike any Plaintiff in this case, the plaintiff in *Range* is a *convicted felon*. *Yancy* pre-dates *Bruen* and involved illegal drug users, which Plaintiffs are not. *Libertarian Party* was abrogated by *Bruen*.
[21] State MOL at p. 20.
[22] The Constitutional Convention did not yield any such requirement. The text mandates it "shall not be infringed."
[23] State MOL at p. 20.
[24] State MOL at p. 21.
[25] Without meeting the requirements under Penal Law 400.00(1), however, a license cannot issue. The regulations therefore do, in fact, ban Plaintiff's ability to possess a handgun and/or carry a handgun in public -just like the failure to establish "proper cause" barred the *Bruen* plaintiffs' ability to carry a handgun in public because no concealed carry license could be issued absent a finding of "proper cause."

*regulations* conditioning the right to keep and bear arms on governmental approval of their cohabitants, significant other, children, etc.

### E. Training Requirement - 400.00(1)(o)

The State has identified *no* Founding Era regulation conditioning the right to keep and bear arms on government-imposed training. The State's reference to Thomas Cooley's quote in *Heller* proves Plaintiffs' position (and *Heller*'s) – that the Second Amendment protects an *individual* right, unconnected to military service. *Bruen*, at 2127 ("That analysis suggested [in *Heller*] that the Amendment's operative clause—"the right of the people to keep and bear Arms shall not be infringed"—"guarantee[s] the individual right to possess and carry weapons in case of confrontation" that does not depend on service in the militia.") quoting *Heller,* at 592.

The State cites several Founding Era regulations that require males aged 16 (or 18) through the age of 45 to appear for service in the militia[26], which further undermine the State's position. First, the militia regulations require properly aged males to appear with their *privately owned* guns, ammunition, bayonet, and belt. [State Exs. 12, 13, 14, 15, 16, 31, 32, and 33]. This *presumes* that males aged 16 (or 18) through 45 (at a minimum) already possessed and/or could freely access guns and ammunition to bring with them to prepare to train for battle.

Second, the militia training was just that – training for *battle* – not training for *self-defense*. So, to the extent that training was imposed by the state guard and/or military, let us be clear about the type of training and the conditions thereof. The militia regulations are no historical analogue to the State's individual training requirements. Nor has the State identified any regulation conditioning the right to keep and bear firearms upon government imposed civilian-based training.

---

[26] See, State Exhibits 12, 13, 14, 15, 16, 31, 32, and 33.

Third, by tying training to militia service, the State's position is undermined even further. Women were not subject to militia service[27], yet women are endowed with the same pre-existing individual and guaranteed right to keep and bear Arms for self-defense that protects all other regular and ordinary citizens.

### F. Social Media - 400.00(1)(o)

The State has identified no historical analogue to the social media requirement, which like the moral character and character references requires the "appraisal of facts, the exercise of judgment, and the formation of an opinion," which have been rejected. *Bruen*, at 2138. This requirement also improperly pits the free exercise of an applicant's First Amendment rights against his Second Amendment rights, leading to means-end scrutiny and interest balancing rejected by the Supreme Court in *Heller, McDonald,* and *Bruen*.[28]

### G. "Other Information" - 400.00(1)(o)

The State has identified *no regulations* that existed at the Founding Era imbuing the government with open-ended authority to require individuals provide whatever other information a licensing officer believes is "reasonably necessary" and "related to the review of the licensing application" before or as a condition to an individual exercising their right to keep and bear weapons for self-defense. Non-objective criteria violate the Second Amendment. *Bruen,* at 2162.

## X. FACIAL CHALLENGE TO STATE 6-MONTH RULE

There was no licensing requirement in the Founding Era; but to the extent that a state imposes a licensing scheme, the *Bruen* Court only sanctioned objective, "shall issue" schemes.

---

[27] Nor were any individuals other than white men, including slaves and Native Americans. Lest there be any question, however, of whether the non-whites were eligible to possess and carry firearms for self-protection, the Fourteenth Amendment put that issue to rest.

[28] The State's twisted attempt to equate the exercise of one's Second Amendment rights to alleged violations of First Amendment rights of convicted sex-offenders is appalling. [State MOL at p. 26]. In any event, *Bruen* rejected intermediate scrutiny tests in Second Amendment challenges.

Even there, the Court cautioned that constitutional violations may be found where such schemes impose "lengthy wait times." *Bruen*, at 2138.[29] Where zero 'wait time' existed to possess and carry firearms in the Founding Era, a wait time of 6 months is unconstitutional.

## XI. PLAINTIFFS' DELAY IN CHALLENGING THE CCIA

Plaintiffs' complaint was filed on August 15, 2022; an amended complaint adding challenges to the provisions of the CCIA was filed on October 28, 2022. Counsel delayed in amending the complaint to challenge the CCIA provisions while awaiting the outcome of the *Antonyuk* (and the *Antonyuk II*) injunction application, which was granted in part on October 6, 2022. Had *Antonyuk II*'s application not been stayed (or an injunction pending appeal been granted) by the Second Circuit, Plaintiffs' challenges to those provisions may he been rendered moot. But the provisions continue to be enforced.[30] Counsel's request to correct a ministerial error in the caption was granted on November 16 and a summons for the amended complaint was finally issued on November 21st. Defendants were served on November 22 and 23, and the Order to Show Cause was filed December 11th.

Plaintiffs' delay, which was motivated by an intent to avoid wasting judicial resources, was reasonable.

## XII. PLAINTIFFS SUFFER IMMINENT HARM FROM THE CCIA

The applicant Plaintiffs, Giambalvo, Mashkow, McLaughlin[31], and Mougios are suffering imminent harm from the CCIA provisions, which *must be* complied with to be found 'eligible' for the issuance of a handgun license under § 400.00(1). Page 2 of the State's required PPB-3

---

[29] "May issue" licensing schemes, like New York's, "may continue to require licenses for carrying handguns for self-defense so long as those States employ objective licensing requirements like those used by the 43 shall-issue States. *Bruen*, at 2162.

[30] As indicated above, the CCIA provisions challenged herein should not be stayed pending the outcome of *Antonyuk*, which involves different plaintiffs and issues.

[31] The executed Declaration of Kevin McLaughlin accompanies this Reply, the unsigned version of which was inadvertently filed with Plaintiffs' initial moving papers.

Application requires the disclosure of the objected information – social media, character references, cohabitants, etc. – to be processed. Enjoining the CCIA requirements would remove the barrier to the licensing process.

## XIII. PENAL LAW 400.00(15) IS A CRIMINAL STATUTE, NOT MERELY A LICENSING REGULATION

Carrying a handgun outside of one's license restriction is a Class A Misdemeanor under Penal Law section 400.00(15).

As discussed above, there was no licensing requirement to carry a handgun for self-defense in the Founding Era, nor has the State identified any historical analogue. In any event, the 'enforcement mechanism'[32], section 400.00(15), is not merely a 'licensing requirement' or a civil penalty; criminal penalties of a misdemeanor conviction, up to 1 year in jail, fines up to $1,000, 3 years of supervisory probation, and community service are examples of the criminal penalties to be imposed; civil penalties include suspension and revocation of one's handgun license – terminating conduct protected by the Second Amendment.

Criminal penalties for engaging in protected activity violate the constitution.

### CONCLUSION

Plaintiffs' application for injunctive relief should be granted in its entirety.

Dated: January 27, 2023
　　　Scarsdale, New York

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiffs*

By: ___*Amy L. Bellantoni*_____
Amy L. Bellantoni (AB3061)
2 Overhill Road, Suite 400
Scarsdale, New York 10583
abell@bellantoni-law.com

---

[32] State MOL at p. 29.