

# MANDATE

## UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 12th day of September, two thousand twenty-five.

Before:      Barrington D. Parker,
             Joseph F. Bianco,
                  *Circuit Judges*,
             Jed S. Rakoff,
                  *District Judge*.*

_____

| | |
|---|---|
| Zachary Giambalvo, John Mougios, Shane Mashkow, Kevin McLaughlin, Michael McGregor, Frank Melloni, Renaissance Firearms Instruction, Inc., and all similarly situated individuals, | **JUDGMENT** <br><br> Docket No. 23-208 |

        Plaintiffs - Appellants,

v.

Suffolk County, New York, Police Commissioner Rodney Harrison, in his Official Capacity, Michael Komorowski, Individually, Eric Bowen, Individually, William Scrima, Individually, William Walsh, Individually, Thomas Carpenter, Individually,

        Defendants - Appellees,

Superintendent Steven G. James, Superintendent of the New York State Police, in his Official Capacity,

        Intervenor - Appellee,

John Does 1-5, Individually, Jane Does 1-5, Individually,

        Defendants.

_____

_____
*Judge Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

MANDATE ISSUED ON 10/07/2025

The appeal in the above captioned case from an order of the United States District Court for the Eastern District of New York was argued on the district court's record and the parties' briefs.

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's decision is AFFIRMED in part and VACATED in part, and the matter is REMANDED for further proceedings consistent with this Court's opinion.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

# United States Court of Appeals
## for the Second Circuit

---

August Term 2023

(Argued: September 27, 2023  Decided: September 12, 2025)

No. 23-208-cv

---

ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, RENAISSANCE FIREARMS INSTRUCTION, INC., AND ALL SIMILARLY SITUATED INDIVIDUALS,

*Plaintiffs-Appellants,*

— v. —

SUFFOLK COUNTY, NEW YORK, POLICE COMMISSIONER RODNEY HARRISON, IN HIS OFFICIAL CAPACITY, MICHAEL KOMOROWSKI, INDIVIDUALLY, ERIC BOWEN, INDIVIDUALLY, WILLIAM SCRIMA, INDIVIDUALLY, WILLIAM WALSH, INDIVIDUALLY, THOMAS CARPENTER, INDIVIDUALLY,

*Defendants-Appellees,*

SUPERINTENDENT STEVEN G. JAMES, SUPERINTENDENT OF THE NEW YORK STATE POLICE, IN HIS OFFICIAL CAPACITY,

*Intervenor-Appellee,*

JOHN DOES 1-5, INDIVIDUALLY, JANE DOES 1-5, INDIVIDUALLY,

*Defendants.*\*

_____

Before:            PARKER and BIANCO, *Circuit Judges*, and RAKOFF, *District Judge*.\*\*

In this case, Plaintiffs-Appellants Zachary Giambalvo, John Mougios, Shane Mashkow, Kevin McLaughlin, Michael McGregor, Frank Melloni, and Renaissance Firearms Instruction, Inc. ("RFI") raise facial Second Amendment challenges to various provisions of the firearm licensing regime under New York's Concealed Carry Improvement Act ("CCIA"), as well as to the manner in which the Suffolk County Police Department ("SCPD") administers that licensing regime. Specifically, Giambalvo, Mougios, Mashkow, and McLaughlin (collectively, the "Applicants") challenge the constitutionality of the following license requirements in the CCIA: (1) the "good moral character" requirement, N.Y. Penal Law § 400.00(1)(b); (2) the requirement that an applicant meet with an officer in-person for an interview and submit certain information, including the identity of other adult household members, whether minor children live in their home, character references, a list of social media accounts, and other information determined to be reasonably necessary, *id.* § 400.00(1)(o) & (1)(o)(i)–(v); and (3) the requirement that an applicant complete eighteen hours of firearms training, including two hours of live-fire instruction, *id.* § 400.00(1)(o)(iii). In addition, the Applicants and McGregor challenge the SCPD's alleged practice of taking more than 30 days—sometimes as long as two to three years—to process the license applications. Finally, the Applicants, along with Melloni and RFI (together, the "Instructors"), challenge the SCPD's alleged policy of arresting individuals handling firearms during the CCIA's mandated live firearm training, in

_____

\* The Clerk of the Court is respectfully directed to amend the caption on this Court's docket to be consistent with the caption on this opinion.

\*\* Judge Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

contravention of a state-law exemption from liability for unlicensed carry in connection with such training, *see id.* § 265.20(a)(3-a) (the "Arrest Policy").

Plaintiffs moved for a preliminary injunction ordering the SCPD to, *inter alia*, cease enforcing the challenged provisions of CCIA's licensing regime, process all handgun license applications within 30 days, and stop enforcement of the Arrest Policy. The United States District Court for the Eastern District of New York (Gary R. Brown, *Judge*), denied the motion, principally concluding that the Applicants lacked standing to challenge the CCIA's licensing requirements because they failed to submit to the challenged licensing regime, and that Plaintiffs lacked standing to challenge the SCPD's Arrest Policy because they did not demonstrate a credible threat of enforcement. *See generally Giambalvo v. Suffolk Cnty.*, 656 F. Supp. 3d 374 (E.D.N.Y. 2023).

We first conclude that the district court erred in determining that the Applicants lack standing to challenge the CCIA provisions. However, we affirm the district court's decision because the Applicants cannot show that they are likely to succeed on the merits of their facial Second Amendment challenges to any of the CCIA provisions, with the exception of the social media disclosure requirement, N.Y. Penal Law § 400.00(1)(o)(iv). As to that provision, we conclude that the preliminary injunction motion is moot because the Superintendent of the New York State Police is presently preliminarily enjoined from enforcing that provision as a result of a separate lawsuit, and there is nothing in the record to suggest that the social media provision is still being enforced in Suffolk County following that injunction. Next, although we conclude that the Applicants have standing to challenge the SCPD's alleged delay in adjudicating handgun license applications, we find that they are unlikely to succeed on their facial challenge in which they claim that any licensing process that exceeds 30 days necessarily violates the Second Amendment. Finally, we disagree with the district court's determination that, at this stage of the litigation, Plaintiffs have not established standing to challenge the SCPD's Arrest Policy, despite allegations that the Commanding Officer of the SCPD's Pistol Licensing Bureau stated that the SCPD will not honor the state-law exception that allows for gun training before a permit is issued and will arrest anyone possessing a gun under those circumstances. We conclude that these alleged statements by the Commanding Officer, which we

accept as true at this stage of the litigation, are sufficient to show standing and the Suffolk County defendants are the proper parties against whom to seek injunctive relief to prevent any such arrest. However, the district court may reassess the standing issue based on further development of the record on remand.

Accordingly, we **AFFIRM** in part, **VACATE** in part, and **REMAND** for further proceedings consistent with this opinion.

> FOR PLAINTIFFS-APPELLANTS: AMY L. BELLANTONI, The Bellantoni Law Firm, Scarsdale, New York.
>
> FOR DEFENDANTS-APPELLEES: ARLENE S. ZWILLING, *for* Dennis M. Brown, Acting Suffolk County Attorney, Hauppauge, New York.
>
> FOR INTERVENOR-APPELLEE: SARAH COCO, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, and Ester Murdukhayeva, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General for the State of New York, Albany, New York.

JOSEPH F. BIANCO, *Circuit Judge*:

In this case, Plaintiffs-Appellants Zachary Giambalvo, John Mougios, Shane Mashkow, Kevin McLaughlin, Michael McGregor, Frank Melloni, and Renaissance Firearms Instruction, Inc. ("RFI") raise facial Second Amendment challenges to various provisions of the firearm licensing regime under New York's Concealed Carry Improvement Act ("CCIA"), as well as to the manner in which the Suffolk County Police Department ("SCPD") administers that licensing regime. Specifically, Giambalvo, Mougios, Mashkow, and McLaughlin (collectively, the "Applicants") challenge the constitutionality of the following license requirements in the CCIA: (1) the "good moral character" requirement, N.Y. Penal Law § 400.00(1)(b); (2) the requirement that an applicant meet with an officer in-person for an interview and submit certain information, including the identity of other adult household members, whether minor children live in their home, character references, a list of social media accounts, and other information determined to be reasonably necessary, *id.* § 400.00(1)(o) & (1)(o)(i)–(v); and (3) the requirement that an applicant complete eighteen hours of firearms training, including two hours of live-fire instruction, *id*. § 400.00(1)(o)(iii). In addition, the Applicants and McGregor challenge the SCPD's alleged practice of taking more

than 30 days—sometimes as long as two to three years—to process the license applications.  Finally, the Applicants, along with Melloni and RFI (together, the "Instructors"), challenge the SCPD's alleged policy of arresting individuals handling firearms during the CCIA's mandated live firearm training, in contravention of a state-law exemption from liability for unlicensed carry in connection with such training, *see id*. § 265.20(a)(3-a) (the "Arrest Policy").

Plaintiffs moved for a preliminary injunction ordering the SCPD to, *inter alia*, cease enforcing the challenged provisions of CCIA's licensing regime, process all handgun license applications within 30 days, and stop enforcement of the Arrest Policy.  The United States District Court for the Eastern District of New York (Gary R. Brown, *Judge*), denied the motion, principally concluding that the Applicants lacked standing to challenge the CCIA's licensing requirements because they failed to submit to the challenged licensing process, and that Plaintiffs lacked standing to challenge the SCPD's Arrest Policy because they did not demonstrate a credible threat of enforcement.  *See generally Giambalvo v. Suffolk Cnty.*, 656 F. Supp. 3d 374 (E.D.N.Y. 2023).

We first conclude that the district court erred in determining that the Applicants lack standing to challenge the CCIA provisions.  However, we affirm

the district court's decision because the Applicants cannot show that they are likely to succeed on the merits of their facial Second Amendment challenges to any of the CCIA provisions, with the exception of the social media disclosure requirement, N.Y. Penal Law § 400.00(1)(o)(iv). As to that provision, we conclude that the preliminary injunction motion is moot because the Superintendent of the New York State Police is presently preliminarily enjoined from enforcing that provision as a result of a separate lawsuit, and there is nothing in the record to suggest that the social media provision is still being enforced in Suffolk County following that injunction. Next, although we conclude that the Applicants have standing to challenge the SCPD's alleged delay in adjudicating handgun license applications, we find that they are unlikely to succeed on their facial challenge in which they claim that any licensing process that exceeds 30 days necessarily violates the Second Amendment. Finally, we disagree with the district court's determination that, at this stage of the litigation, Plaintiffs have not established standing to challenge the SCPD's Arrest Policy, despite allegations that the Commanding Officer of the SCPD's Pistol Licensing Bureau stated that the SCPD will not honor the state-law exception that allows for gun training before a permit is issued and will arrest anyone possessing a gun under those circumstances. We

conclude that these alleged statements by the Commanding Officer, which we accept as true at this stage of the litigation, are sufficient to show standing and the Suffolk County defendants are the proper parties against whom to seek injunctive relief to prevent any such arrest. However, the district court may reassess the standing issue based on further development of the record on remand.

Accordingly, we **AFFIRM** in part, **VACATE** in part, and **REMAND** for further proceedings consistent with this opinion.

## BACKGROUND

In the wake of the Supreme Court's decision in *New York State Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), striking down New York's "proper cause" requirement for a concealed handgun permit, the New York State Legislature passed the CCIA, which amended, among other provisions, New York's firearm licensing regime. Relevant here, the CCIA requires that applicants for both in-home (or "dwelling") and concealed-carry licenses must have "good moral character" to obtain a license, which it defines as "having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." N.Y. Penal Law § 400.00(1)(b).

To aid licensing officers in making this good moral character determination, every applicant for a concealed-carry license must attend an in-person interview with the licensing officer and disclose certain information to that officer, including: (1) the "names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home," *id.* § 400.00(1)(o)(i); (2) the "names and contact information of no less than four character references who can attest to the applicant's good moral character," *id.* § 400.00(1)(o)(ii); (3) "a list of all of the applicant's former and current social media accounts" from the preceding three years, *id.* § 400.00(1)(o)(iv); and (4) other information "required by the licensing officer that is reasonably necessary and related to the review of the licensing application," *id.* § 400.00(1)(o)(v). In addition, applicants must provide proof that they completed eighteen hours of firearm safety training, including two hours of live-fire training. *Id.* § 400.00(1)(o)(iii), (19). Applicants are exempted from liability for unlicensed carry of a firearm while undergoing live-fire training if they are supervised by a duly authorized instructor. *Id.* § 265.20(a)(3-a). Local governments may also pass "any local law, code, ordinance, rule or regulation that

is more restrictive than any requirement set forth in or established by this article."

*Id*. § 400.30.

A license "shall be issued" to an applicant satisfying the state and local requirements. *Id.* § 400.00(2). Licensing officers must process an application for a license within six months of being presented with the State's license application, known as the "PPB-3", or provide written reason for the delay. *Id.* § 400.00(4-b).

In certain parts of Suffolk County, the SCPD has the statutory authority to process and approve licensing applications. As alleged in the operative complaint, the SCPD licensing process operates as follows: The SCPD first requires applicants to complete the SCPD's own "Applicant Questionnaire" and pay a ten-dollar fee. The SCPD will then assign an investigator to the applicant and schedule an in-person interview, a process that alone can take up to two to three years. At the interview, the applicant provides certain documents, pays another application fee, and is fingerprinted and photographed. At that same interview, the applicant fills out the State's PPB-3 application, including disclosing the information required under the CCIA. *See id.* § 400.00(1)(o)(i)–(ii), (iv)–(v). Once the applicant completes the PPB-3 application, the six-month statutory adjudication clock starts to run. *See id.* § 400.00(4-b).

According to Plaintiffs, the SCPD also has a policy of arresting unlicensed individuals participating in live-fire training with a duly authorized instructor for the unlawful possession of a firearm, *see id*. § 265.01, even though state law expressly exempts such individuals from liability, *see id.* § 265.20(a)(3-a) (Section 265.01 "shall not apply to" "[p]ossession of a pistol or revolver by a person undergoing live-fire range training pursuant to section 400.00 of this chapter while such person is undergoing such training and is supervised by a duly authorized instructor.").

Plaintiffs filed their initial complaint in August 2022, prior to the passage of the CCIA.  In October 2022, after the CCIA came into effect, Plaintiffs filed an amended complaint, asserting claims for violations of their First, Second, and Fourteenth Amendment rights under 42 U.S.C. § 1983 against Suffolk County, Suffolk County Police Commissioner Rodney Harrison, SCPD officers, including Captain William Scrima, Lieutenant Michael Komorowski, Sergeant Eric Bowen, Sergeant William Walsh, Investigator Thomas Carpenter, and unnamed Suffolk County employees assigned to SCPD's Licensing Bureau (together, the "County"),

as well as the then-Acting Superintendent of the New York State Police (the "State").[1]

Plaintiffs Giambalvo, Mougios, Mashkow, and McLaughlin are residents of Suffolk County. They each applied for a firearm license with the SCPD by filling out the SCPD's Applicant Questionnaire and paying the associated fee. The SCPD advised these Applicants that the wait time for an interview would be between one to three years. Each of these Applicants also averred that they have not or would not comply with various aspects of the licensing process. During the pendency of this appeal, the SCPD denied Giambalvo's and Mougios's applications, but issued dwelling licenses to Mashkow and McLaughlin.

McGregor possesses a concealed carry license restricted to sportsman activities. He sought to remove the restriction but was informed that he needed to take additional steps, including completing the 18-hour training requirement, which McGregor refuses to do. According to the County, as of October 2024,

---

[1] On April 11, 2023, after Plaintiffs filed this instant appeal, they voluntarily dismissed with prejudice their claims against the State. *See* Dist. Ct. Dkt. No. 45. The State then filed a motion to intervene in this appeal, which we granted. *See* App. Ct. Dkt. Nos. 50, 100.

McGregor no longer resides in Suffolk County and is therefore no longer subject to the SCPD's licensing authority.

The Instructors—Melloni, a certified firearms instructor, and RFI, his firearms instruction company—provide an 18-hour firearms training curriculum for individuals applying for the concealed-carry license. Melloni avers that, sometime in or before October 2022, he was informed by SCPD Lieutenant Michael Komorowski—the "Commanding Officer of the Pistol Licensing Bureau," App'x at 132, who is "directly responsible for enforcing and implementing the licensing policies and procedures of the SCPD Licensing Bureau," *id.* at 19—that the SCPD will "arrest anybody who handles a pistol or revolver without a New York State pistol permit" and that it is "not honoring" the state-law exception that allows for live-fire gun training before a permit is issued, *id.* at 119. After learning of this Arrest Policy, Melloni canceled the registration of four unlicensed individuals who had paid and signed up for his 18-hour training course. Despite the possibility of being subject to this Arrest Policy, Giambalvo averred that he still had concrete plans to take the Instructors' course in the future.

In December 2022, Plaintiffs moved to preliminarily enjoin the County from enforcing, *inter alia*, (1) the CCIA's good moral character, in-person interview,

disclosure, and firearms training requirements; (2) an application adjudication period that exceeds 30 days; and (3) the SCPD's Arrest Policy.[2]  The district court denied the motion.  *See generally Giambalvo*, 656 F. Supp. 3d 374.  The district court principally concluded that the Applicants lacked standing to challenge various provisions of the licensing application process because they did not first comply with that process.  *Id.* at 381–82.  The district court also concluded that Plaintiffs lacked standing to assert a pre-enforcement challenge to the SCPD's Arrest Policy.  *Id.* at 382–85.  The district court did not consider the Applicants' request for a preliminary injunction ordering the SCPD to process the applications within 30 days based on their challenges to the SCPD's processing delays.

This appeal followed.

## DISCUSSION

"We review the denial of a motion for a preliminary injunction for abuse of discretion, which we will identify only if the decision rests on an error of law or a

---

[2] Plaintiffs also sought to preliminarily enjoin the enforcement of other provisions of the CCIA, including Section 400.00(15).  *See* Dist. Ct. Dkt. No. 27 at 2.  However, on appeal, plaintiffs do not specifically challenge the denial of those portions of their preliminary injunction motion.  Accordingly, any such arguments are deemed waived.  *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief.").

clearly erroneous finding of fact, or cannot be located within the range of permissible decisions." *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 102 (2d Cir. 2024) (internal quotation marks and citation omitted). "We may, of course, affirm on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely." *Name.Space, Inc. v. Network Sols., Inc.*, 202 F.3d 573, 584 (2d Cir. 2000) (citation omitted).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Ordinarily, "[a] plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Id.* at 20. However, "when, as here, the preliminary injunction will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, it should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Cent. Rabbinical Cong. of U.S. & Can. v. N.Y. City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014) (alteration adopted) (internal quotation marks and citation omitted). "That is, plaintiffs must establish a clear or substantial

likelihood of success on the merits." *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (per curiam) (internal quotation marks and citation omitted).

## I.      Challenges to the CCIA's License Application Requirements

*A. Standing*

We first consider whether the Applicants have standing to challenge the license requirements set forth in the CCIA without first completing the application process.  We conclude that they do.

To establish standing, "a plaintiff must show [(1)] that he suffered an injury in fact that is concrete, particularized, and actual or imminent; [(2)] that the injury was likely caused by the defendant; and [(3)] that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). At the preliminary injunction stage, a plaintiff cannot rely on mere allegations and instead must set forth, by affidavit or other evidence, specific facts, which will be taken to be true, to establish standing.  *See Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 119 (2d Cir. 2025) (per curiam).

An injury in fact is "an invasion of a legally protected interest which is [(1)] concrete and particularized and [(2)] actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation

marks and citations omitted).  In the context of a Second Amendment challenge to a firearm license application process, we have said that when a plaintiff "argues that a portion of the application *process* is unconstitutional," his "injury flows from the application itself."  *Antonyuk v. James*, 120 F.4th 941, 979 (2d Cir. 2024) (emphasis in original), *cert. denied*, 2025 WL 1020368 (U.S. Apr. 7, 2025) ("*Antonyuk II*").  Thus, even if the plaintiff's "injury stems from his own unwillingness to comply with the challenged requirements," he suffers an injury-in-fact that is traceable to the defendant's allegedly unlawful conduct if it deters the plaintiff from engaging in constitutionally protected activity "due to [the plaintiff's] individual, but reasonable, sensibilities."  *Id.* at 977.

Applying those principles here, we conclude that the district court erred in determining that the Applicants lacked standing to bring a facial challenge to certain components of the CCIA's licensing application process because they did not, or would refuse to, complete the application process.  In making that determination, the district court relied chiefly on our statement in *United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012), that a plaintiff who "failed to apply for a gun license in New York [ ] lacks standing to challenge the licensing laws of the state."  *Giambalvo*, 656 F. Supp. 3d at 382 (quoting *Decastro*, 682 F.3d at 164).  However, in

*Antonyuk II*, we clarified that *Decastro* only governs cases where a plaintiff challenges rules "that limit[] *eligibility* for a license," not cases where the plaintiff "challeng[es] a component of the application process itself." *Antonyuk II*, 120 F.4th at 978 (emphasis in original). Here, like in *Antonyuk II*, the Applicants argue "that a portion of the application *process* is unconstitutional." *Id.* at 979 (emphasis in original). Their alleged injury therefore "flows from the application itself, not from [their] asserted ineligibility for a license," because the process "deter[s] the [Applicants] due to [their] individual, but reasonable, sensibilities." *Id.* at 977, 979. Thus, where, as here, the Applicants "challenge[] the application itself (or as here, a portion thereof), [they are] *not* required to first apply for and be refused a license" in order to establish standing. *Id.* at 980 (emphasis in original).

In short, the Applicants have established each of the standing requirements. As in *Antonyuk II*, the Applicants are deterred from completing their license application and are "injured by the consequent inability to exercise [their alleged] Second Amendment rights." *Id.* at 977. "[T]hat injury is traceable to the defendants' enforcement of [the challenged] provisions," and "the injury is redressable by the injunction that [the Applicants] seek[]." *Id.* Accordingly, the

district court erred in concluding that the Applicants lacked standing to challenge each of the CCIA provisions.

## B. Merits

We now turn to the merits of the Applicants' challenges to the CCIA provisions, an issue the district court did not reach.[3]  As explained below, we affirm the district court's denial of a preliminary injunction enjoining the SCPD's

---

[3]  The County declined to address the constitutionality of the CCIA provisions, contending that Suffolk County "cannot be considered a violator of plaintiffs' constitutional rights" because it is merely "implementing mandatory state law by carrying out the CCIA."  Appellee's Br. at 3 n. 2 (citing *Vives v. City of New York*, 524 F.3d 346, 353 n.4 (2d Cir. 2008)).  We agree that Suffolk County itself likely cannot be enjoined from implementing mandatory state laws as to which it exercises no discretion.  In *Vives*, we held that a municipality could not be found liable for damages under Section 1983 for implementing a mandatory state law because that was not a "conscious choice" that constituted a "custom or policy," as required for municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  524 F.3d at 353 & n.4.  Because *Monell*'s "'policy or custom' requirement also applies when plaintiffs seek prospective relief, such as an injunction or a declaratory judgment," *Los Angeles v. Humphries*, 562 U.S. 29, 31 (2010), our reasoning in *Vives* appears to equally bar enjoining a municipality from implementing mandatory state laws.  However, we need not decide this issue because the individual County defendants can be enjoined from implementing the challenged mandatory state laws.  With respect to the individual County defendants, the County argues that they are "entitled to qualified immunity for enforcing a state statute that has not been struck down as unconstitutional."  Appellee's Br. at 3 n. 2 (citing *Amore v. Novarro*, 624 F.3d 522 (2d. Cir. 2010)).  That argument misses the mark.  We have made clear that "qualified immunity does not protect a public official against a claim for declaratory or injunctive relief."  *Vincent v. Yelich*, 718 F.3d 157, 177 (2d Cir. 2013).  Accordingly, we reject the County's contention that a federal court cannot enjoin the individual County defendants from enforcing state laws, if it finds those laws to be unconstitutional.

enforcement of these provisions because the Applicants cannot show a clear or substantial likelihood of succeeding on their constitutional challenges to these provisions, with the exception of the social media requirement. As to that provision, we conclude that the motion for a preliminary injunction is moot because the State is already presently preliminary enjoined from enforcing that requirement, and there is no evidence in the record that Suffolk County is continuing to enforce the provision in light of the existing injunction.

We first reiterate some core Second Amendment jurisprudential principles germane to this appeal. The Second Amendment, made applicable to the states through the Fourteenth Amendment, provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Under *Bruen*, the Supreme Court articulated a two-step framework to evaluate Second Amendment challenges. First, we must ask whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If it does not, the constitutional inquiry ends, and a plaintiff's challenge to the law fails. If the individual's conduct is covered, then "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by

demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* In considering the second inquiry, we must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." *Id.* at 29 & n.7. "Why and how the regulation burdens the right are central to this inquiry." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). "[W]hen a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster. The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (internal quotation marks and citation omitted). At bottom, the test does not require our country's gun regulations to be "trapped in amber." *Id.* at 691.

In *Antonyuk II*, we further delineated the proper legal contours of this analytical approach so as, in the wake of *Bruen*, to "offer[] further guidance for how to assess the historical record" in analyzing firearm regulations under the Second Amendment. 120 F. 4th at 991 n.43.[4] We made clear that "[t]he absence of

---

[4] We note that "[o]rdinarily, findings of fact and conclusions of law made in a preliminary injunction proceeding do not preclude reexamination of the merits at a subsequent trial."

a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much." *Id*. at 969. "Reasoning from historical silence is . . . risky," we explained, because "[t]here are many reasons why the historical record may not evidence statutory prohibitions on a given practice," such as the existence of "custom, universal practice, or private warning." *Id*. at 969–70. In other words, "[t]he paucity of eighteenth century gun control laws

*Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998). However, even in the preliminary injunction posture (as in *Antonyuk II*), a well-considered conclusion of law by a panel of this Court in a published opinion, which addresses a pure issue of law that cannot be impacted by further development of the record, is binding precedent, as with any other published decision. *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1114 (9th Cir. 2007) (explaining that, while "the district court should abide by 'the general rule' that our decisions at the preliminary injunction phase do not constitute the law of the case . . . [a]ny of our conclusions on pure issues of law . . . are binding" (citation omitted)); *see also Roe v. Alabama*, 68 F.3d 404, 408 (11th Cir. 1995) (per curiam) (applying the law-of-the-case doctrine and concluding that "[a]lthough the law established by the prior panel was announced in a preliminary injunction posture, . . . the principle of law adopted was clear"); *Nat'l Airlines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 430 F.2d 957, 960 (5th Cir. 1970) (recognizing that the law-of-the-case doctrine applies to preliminary injunctions and stating that "[t]he exception to law of the case where evidence on a subsequent trial is substantially different is inapplicable where by the prior appeal the issue is not left open for decision" (internal punctuation and citations omitted)); 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4478.5 (2002) ("A fully considered appellate ruling on an issue of law made on a preliminary injunction appeal . . . become[s] the law of the case for further proceedings in the trial court on remand and in any subsequent appeal.") (collecting cases).

might have reflected a lack of political demand rather than constitutional limitations." *Id.* at 970 (internal quotation marks and citation omitted).

We also emphasized that it is "not dispositive whether *comparable* historical regulations exist in significant numbers." *Id.* at 971 (emphasis in original). To be sure, "a one-off and short-lived territorial law, military decree, or local law, while no doubt relevant, will not carry the day if it contradicts the overwhelming weight of other evidence." *Id.* at 969. However, the silence of some jurisdictions "does not command the inference that legislators there deemed some other jurisdiction's regulation inconsistent with the right to bear arms." *Id.* at 972. In a similar vein, although evidence that "some jurisdictions actually attempted to enact analogous regulations that were rejected on constitutional grounds surely would provide some probative evidence of constitutionality, the lack of any disputes regarding the lawfulness of such prohibitions may lead to the inference that it was settled that states could prohibit or regulate arms in that manner consistent with the Second Amendment." *Id.* (alteration adopted) (internal quotation marks and citations omitted).

Finally, we held that "[b]ecause the CCIA is a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of

our analysis." *Id.* Moreover, "[w]hile we recognize that evidence nearest to 1791 can differ from that nearest to 1868, such discrepancy does not mean that the right to keep and bear arms was calcified in either 1791 or 1868. Rather, 1791 and 1868 are both fertile ground, and the adjacent and intervening periods are likewise places in the historical record to seek evidence of our national tradition of firearms regulation." *Id.* at 974.

Bearing those principles in mind, we proceed to analyze the Applicants' challenge to each of the CCIA's licensing requirements in turn.

### i. *Requirements Adjudicated by Antonyuk II*

We have already adjudicated the likely constitutionality of some of the challenged provisions here in *Antonyuk II*. There, in a preliminary injunction posture, we found that the plaintiffs were unlikely to succeed on the merits of their challenges to the good moral character requirement, N.Y. Penal Law § 400.00(1)(b), the family relations disclosure requirement, *id.* § 400.00(1)(o)(i), and the catch-all disclosure requirement, *id.* § 400.00(1)(o)(v*). See Antonyuk II*, 120 F.4th at 980–1002. We recognize that the panel in *Antonyuk II* correctly emphasized that the parties could submit additional evidence in that case (or a future case, such as this one) regarding the history and tradition of our Nation's firearm laws that could affect

its preliminary determinations with respect to the historical record for the firearms provisions at issue. *See id.* at 1048 n.126 ("We emphasize that we are here reviewing facial challenges to these provisions at a very early stage of this litigation. A preliminary injunction is not a full merits decision, but rather addresses only the *likelihood* of success on the merits. Our affirmance or vacatur of the district court's injunction does not determine the ultimate constitutionality of the challenged CCIA provisions, which await further briefing, discovery, and historical analysis, both in this case as it proceeds and perhaps in other cases." (emphasis in original) (internal quotation marks and citations omitted)). Here, with respect to these challenged provisions, the Applicants have not submitted any additional historical evidence that was not before the Court in *Antonyuk II*. In any event, we have re-examined the historical record and find the well-reasoned and thorough analysis in *Antonyuk II* persuasive and adopt it fully herein as to the relevant provisions. Accordingly, the Applicants have not shown the requisite likelihood of success on the facial constitutional challenges to the good moral character, family relations, or catch-all disclosure requirements and, on that basis, we affirm the denial of a preliminary injunction as to these provisions.

In addition, in *Antonyuk II*, we concluded that the social media disclosure requirement, N.Y. Penal Law § 400.00(1)(o)(iv), was likely unconstitutional and therefore affirmed the district court's preliminary injunction against the State as to the enforcement of that provision. 120 F.4th at 1002–04. That determination renders the challenge against the same provision here moot.

"The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983). As one of our sister courts has recently explained, the grant of a preliminary injunction in one case moots a plaintiff's subsequent request for similar relief in a different case if "any relief granted by [the subsequent] court would not have any real-world effect." *We the Patriots, Inc. v. Grisham*, 119 F.4th 1253, 1258 (10th Cir. 2024) (concluding that where a district court in a different case already preliminarily enjoined the state from enforcing a restriction on firearm carry in public parks, the plaintiff in this case lacked standing to challenge a denial of the preliminary injunction its own case). Where, as in *Antonyuk II*, a panel of this Court has affirmed the other district court's preliminary injunction on the merits, there is no "reasonable expectation that the [] complaining party [here] will

be subjected to the same action again," as to evade mootness.[5]  *United States v.*

*Sanchez-Gomez*, 584 U.S. 381, 391 (2018) (internal quotation marks and citation

omitted).

To be sure, the preliminary injunction upheld by *Antonyuk II* enjoins the

State and certain other county and municipal defendants, not the Suffolk County

defendants here, from enforcing the social media requirement.  *See generally*

*Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 248 (N.D.N.Y. 2022), *aff'd in part, vacated*

*in part, remanded sub nom. Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024).  However,

there is no indication in the record, nor do Plaintiffs even allege, that the County

is presently enforcing a state law provision that the State is actively enjoined from

enforcing.  Indeed, we take judicial notice of the current version of the SCPD's

Application Questionnaire, which does not ask the applicant to disclosure any of

his social media account information.  *See Suffolk Cnty. Police Dep't, Pistol License*

---

[5]  The mootness analysis may be different where this Court has yet to rule on the other district court's preliminary injunction order, where that district court is not within our Circuit, or where there is some particularized reason to believe that the injunctive order is on shaky legal footing.  *See, e.g., Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1281 (11th Cir. 2021) (declining to find mootness where a district court in another circuit issued a nationwide injunction, because "there was a reasonable expectation that" the other circuit "would not uphold the nationwide aspect of the injunction").  We need not, and do not, consider those scenarios here.

*Applicant Questionnaire*, https: //suffolkpd.org/Portals/18/scpd_pdfs/formsandreports/PDCS4406nRev3.pdf (last visited September 8, 2025); *see also Hotel Emps. & Rest. Emps. Union, Loc. 100 of N.Y., N.Y., AFL CIO v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 (2d Cir. 2002) ("Under Fed. R. Evid. 201(b)(2), '[a] judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'"). In short, it is evident to us that the "relief sought" by the Applicants—enjoining the enforcement of the social media requirement—is "no longer needed." *Martin-Trigona*, 702 F.2d at 386. Therefore, the challenge to the denial of the preliminary injunction as to the social media requirement is moot.

ii. *Character Reference Requirement*

Turning now to those constitutional challenges to the license requirements for which *Antonyuk II* did not address the likelihood of success on the merits, we first find that the character reference requirement, N.Y. Penal Law § 400.00(1)(o)(ii), is likely constitutional.

Section 400.00(1)(o)(ii) requires an applicant to disclose "names and contact information of no less than four character references who can attest to the

applicant's good moral character and that such applicant has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others."

As we explained in *Antonyuk II,* it "must [] be constitutional for the licensing authority to investigate the applicant's character," and it "follows that the State can [] require modest disclosures of information that are relevant to that investigation and that will make the (permissible) assessment of dangerousness more efficient and more accurate." 120 F.4th at 1001. We also determined that the "disclosure of one's cohabitants," which *Antonyuk II* found likely constitutional, "is tantamount to the character-reference provision." 120 F.4th at 1000. It follows, then, that the character references requirement too is likely constitutional because it eminently furthers the efficiency and accuracy of a licensing officer's character assessment. *See Antonyuk v. Hochul*, 639 F. Supp. 3d at 306 (finding five colonial "gun laws based on a reputation-based perception of an individual" and three other historical statutes "requiring an applicant to provide character references to be permitted to carry a gun," which together "constitute a historical tradition of firearm regulation based on reputation (for example, by a reasonable number of character references)"). We therefore conclude that the Applicants are not likely

to succeed in their challenge to the character reference requirement and, thus, affirm the district court's denial of the preliminary injunction as to this requirement. [6]

### iii.    In-Person Interview Requirement

We also conclude that the in-person interview requirement is likely to pass constitutional muster. Section 400.00(1)(o) mandates that all persons applying for a concealed carry license "meet in person with the licensing officer for an interview." The purpose of that requirement is to provide the licensing officer with a face-to-face opportunity to assess the applicant's character—that is, their potential dangerousness. The State has proffered numerous regulations, spanning from the colonial era to the Reconstruction era, that similarly required individuals

---

[6] In its post-*Antonyuk* briefing, Plaintiffs argued for the first time, in a footnote, that it is Section 400.00(1)(i)(ii)'s specific requirement that the character references must "'attest' (swear) that the applicant has never 'engaged in any acts or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others'" that renders the provision "overbroad, subjective" and therefore "repugnant to the plain text of the Second Amendment, historical tradition, and Supreme Court precedent." Appellants' Post-Argument Br. at 4 n.2 (emphases omitted) (quoting N.Y. Penal Law § 400.00(1)(o)(ii)). We have repeatedly made clear, however, that "[w]e do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review." *Dow Jones & Co. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295, 301 n.7 (2d Cir. 2006). Moreover, where, as here, a party only adverts to an issue "in a perfunctory manner, unaccompanied by some effort at developed argumentation," we will deem such issues waived. *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001).

to appear in person for the governing authority to make similar assessments. *See* Intervenor Br. at 28–30. For example, during the Founding era, at least six colonies (Massachusetts, Pennsylvania, Maryland, North Carolina, Virginia, and New York) required individuals suspected of disloyalty to appear in person to swear an oath before a justice of the peace or face disarmament. *See* Dist. Ct. Dkt No. 34, Exs. 6–11 (collecting laws from 1776–77 from these colonies). The evident purpose of these requirements was for the justices of peace to ascertain the candor of the individual and assess whether they might continue to pose a danger to the revolutionary cause. We have little trouble concluding that the in-person interview requirement is relevantly similar, both in the how and why, to these established and representative gun regulations within our Nation's history and tradition. Therefore, we affirm the denial of the preliminary injunction as to this requirement.

> *iv.  Firearms Training Requirement*

Finally, we hold that the CCIA's 18-hour firearms training requirement is likely constitutional.

At the outset, we underscore that the Supreme Court has included firearm training requirements as part of presumptively constitutional shall-issue licensing

regimes. First, in *Heller*, the Supreme Court made clear that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." 554 U.S. at 626–27 & n.26. Subsequently, in *Bruen*, the Supreme Court went out of its way to clarify that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." 597 U.S. at 13 n.9. It explained that those regimes— which it recognized "*often require applicants to . . . pass a firearms safety course*"—are not constitutionally suspect because they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* (emphasis added) (internal quotation marks and citation omitted); *see also id.* at 79– 80 (Kavanaugh, J., concurring) ("[T]he Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense," which "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, *and training in firearms handling* and in laws regarding the use of force, among other possible requirements." (emphasis added)); *People v. Thompson*, -- N.E.3d --, 2025 WL 1759061, at *10 (Ill. 2025) ("[T]he *Bruen* Court expressly authorized requirements for training in firearm handling to ensure that the applicant is, in fact, responsible and law-abiding."); *cf. Maryland*

*Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222 (4th Cir. 2024) (en banc) ("[N]on-discretionary 'shall-issue' licensing laws are presumptively constitutional."), *cert. denied*, 145 S. Ct. 1049 (2025).  Thus, plaintiffs seeking to preliminarily enjoin the enforcement of a firearms training requirement must make at least *some* showing to overcome this presumptive constitutionality as part of their burden of establishing "a clear or substantial likelihood of success on the merits."  *Sussman*, 488 F.3d at 140 (internal quotation marks and citation omitted); *see also, e.g., Bruen*, 597 U.S. at 13 n.9 (suggesting the possibility of constitutional challenges to shall-issue licensing regimes where the plaintiff can allege that the scheme is being "put toward abusive ends," or involves, for example, "lengthy wait times" and "exorbitant fees" that effectively "deny ordinary citizens their right to public carry").

Here, the Applicants fail to make any argument to persuasively rebut the presumptive validity of the CCIA's 18-hour firearms training requirement.  That failure alone defeats their ability to show the requisite clear or substantial likelihood of success as to their constitutional challenge.[7]

---

[7]  In arguing that the firearms training requirement is also consistent with our nation's history and tradition of gun regulations, the State relies on founding-era militia laws that

At best, the Applicants seem to argue that the 18-hour training courses are too costly and thereby infringe on their Second Amendment rights. They are unlikely to prevail under that theory. To succeed on a facial challenge, the Applicants must "establish that no set of circumstances exists under which the [challenged provision] would be valid." *Rahimi*, 602 U.S. at 693 (internal quotation marks and citation omitted). Here, the Applicants allege that the cost of such a training course "in and around Nassau and Suffolk County [is] between [] $400 and $800." App'x at 41. Putting aside the fact that those fees are charged by private parties, not the State or municipal governments, the Applicants have not plausibly alleged that *all* training courses within New York State are so costly. In

---

required members to participate in mandatory firearm training. *See* Intervenor Br. at 37 (citing a 1780 New York law, 1785 Virginia law, 1792 federal law, 1806 New Jersey law, and 1822 Pennsylvania law); *see also* Dist. Ct. Dkt No. 34, Exs. 16, 31–33. The Applicants counter that these militia statutes "did not apply to the general population, are not comparable to the 18-hour curriculum in substance or purpose, did not result in the loss of firearm rights if one did not appear for training (only a fine), and required participants to bring their own guns," which "[m]eant that the general possession and carriage of firearms was presumed." Appellants' Reply Br. at 28 (footnotes and emphasis omitted). Although we found some of these arguments unpersuasive in *Antonyuk II* when determining that the State's proffered militia laws were "relevantly similar" to a challenged sensitive location provision, *see* 120 F.4th at 1010–12, we need not address these arguments here because we rely upon the presumptive validity of the firearms training requirement at this preliminary stage. As we noted in *Antonyuk II*, our decision here "does not determine the ultimate constitutionality of the challenged CCIA provisions, which await further briefing, discovery, and historical analysis, both in this case as it proceeds and perhaps in other cases." 120 F.4th at 1048 n.126.

any case, a training course that costs $400 is unlikely to be "exorbitant[ly]" expensive.  *See Bruen*, 597 U.S. at 38 n.9 ("exorbitant fees" are subject to constitutional challenge).  Indeed, more than ten years ago, we upheld a $340 handgun licensing fee as constitutional, explaining that such an amount was not "anything more than a marginal, incremental, or even appreciable restraint" on an individual's Second Amendment rights.  *Kwong v. Bloomberg*, 723 F.3d 160, 167 (2d Cir. 2013) (internal quotation marks and citation omitted); *see also* U.S. Bureau of Labor Statistics, *CPI Inflation Calculator*, https://www.bls.gov/data/inflation_calculator.htm (last visited July 21, 2025) ($340 in July 2013 equates to approximately $434 in October 2022).  In sum, because at least some of the training courses being offered are not so prohibitively expensive so as to rise to a Second Amendment violation, the Applicants are unlikely to succeed on their facial challenge to the training requirement on this ground.

Accordingly, we affirm the denial of a preliminary injunction as to the 18-hour firearms training requirement.

## II.    Challenges to the Licensing Delays

*A. Standing*

We next consider the Applicants' challenge to the SCPD's licensing processing timeline, which allegedly can take up to several years.[8]  The district court did not directly consider this challenge.  On appeal, the County contends that the Applicants lack standing to challenge its license processing timeline because "the [A]pplicants cannot receive permits from the County regardless of how long they wait," since they refuse to comply with the CCIA requirements and "the County cannot lawfully issue licenses to persons who refuse to comply with the CCIA."  Appellee's Br. at 12.  We are unpersuaded.

First, as *Bruen* indicates, sufficiently "lengthy wait times" can themselves be concrete constitutional injuries.  597 U.S. at 39 n.9.  That is because significant processing delays in effect "deny ordinary citizens their right to public carry."  *Id.* We also see no causation problem.  The SCPD's lengthy processing timeline for

---

[8] We note that McGregor may no longer have standing to assert his challenge to the delay because that challenge may now be moot.  According to the County, McGregor now lives in Westchester County and is therefore no longer subject to SCPD's licensing authority.  Plaintiffs have not disputed that representation.  However, because we conclude that the Applicants have "the requisite standing" to challenge the County's general licensing timeline, we "therefore have no occasion to decide the standing" of McGregor.  *Carey v. Population Servs., Int'l*, 431 U.S. 678, 682 (1977).

the Applicants' applications is not the result of the Applicants' own refusal to furnish the requisite application materials, as the County seems to suggest. Instead, the Applicants' declarations indicate that, as a matter of course, the SCPD informed them that it could take upwards of two to three years to even schedule an interview, without regard to the contents of their applications. *See, e.g.*, App'x at 95 (stating that a Licensing Bureau employee informed Giambalvo that "it's going to take about a year and a half to 2 years to get called for the interview"). Thus, in theory, the injury may be redressed by ordering the SCPD to expedite the review process. We are therefore satisfied that the Applicants have met all the standing requirements to challenge the SCPD's license processing timeline.[9]

*B. Merits*

Although we are concerned with the SCPD's lengthy processing timeline, the Applicants are unlikely to succeed in obtaining the specific injunctive relief that they seek—namely, a mandate that all license processing be completed within 30 days. Specifically, the Applicants seek an injunction ordering the SCPD to

---

[9] The adjudication of some portions of the Applicants' applications during the pendency of this appeal does not render their challenges to the delays moot. Mashkow and McLaughlin were only issued dwelling licenses and may continue with the application process to obtain a concealed-carry license. Giambalvo and Mougios may appeal the denial of their applications. Thus, the Applicants' applications remain pending.

"within 30 days of the presentment of the completed PPB-3 application, issue a handgun license to all applicants eligible to possess firearms under state and federal law, including Plaintiffs." Dist. Ct. Dkt. No. 27 at 2; *see also* App'x at 58 (seeking to enjoin the County from "implementing a licensing process that exceeds 30 days from the presentment of the completed State Application PPB-3 and issuance of a license (or denial thereof)"); Appellants' Br. at 25 ("SCPD should be mandated to issue a license or a determination within 30 days of an applicants' initiation of the licensing process.").

The Applicants cannot show a likelihood of success to warrant this relief because nothing in the Second Amendment prescribes a bright-line 30-day time limit. The Applicants offer no explanation for why they believe that the Constitution mandates such a timetable. Instead, they principally contend that "[d]elaying the exercise of a guaranteed preexisting right to any degree violates the plain text [of the] Second Amendment." Reply Br. at 6 (emphasis omitted). From there, it seems that the Applicants arbitrarily selected a timeframe, asserting that their "suggested 30-day limit was generous." *Id.*

We first reject the Applicants' intimation that *any* delay violates the plain text of the Second Amendment. As *Bruen* explained, presumptively constitutional

shall-issue licensing regimes "often require applicants to undergo a background check or pass a firearms safety course." 597 U.S. at 13 n.9. Those requirements, as the Applicants acknowledge, necessarily require *some* amount of processing time. Accordingly, *Bruen* only greenlighted constitutional challenges to processing delays that are sufficiently "lengthy" such that they in effect "deny ordinary citizens their right to public carry." *Id*. Thus, a short delay does not violate an individual's Second Amendment rights. *See Antonyuk II*, 120 F.4th at 985 n.32 (agreeing that a shall-issue permit process is "presumptively constitutional" "despite some delay occasioned by" it (internal quotation marks and citation omitted)); *see also Maryland Shall Issue*, 116 F.4th at 227 (rejecting an argument that "any temporary delay" constitutes an infringement of Second Amendment rights); *McRorey v. Garland*, 99 F.4th 831, 839 (5th Cir. 2024) ("Our law is plain as can be that some amount of time for background checks is permissible.").

We also cannot conclude that the Applicants are likely to succeed on their claim that any licensing process that takes more than 30 days is *per se* sufficiently lengthy to violate their Second Amendment rights. We have previously disagreed that a waiting period of 30 days for the purchase of a firearm constitutes a "lengthy wait time" under *Bruen*. In *Antonyuk v. Chiumento*, 89 F.4th 271, 315 (2d Cir. 2023)

("*Antonyuk I*"), *cert. granted, judgment vacated sub nom. Antonyuk v. James*, 144 S. Ct. 2709 (2024), *and reinstated in part by Antonyuk II*, 120 F.4th 941, we found that the Fourth Circuit's conclusion in *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1040 (4th Cir. 2023), *rev'd on reh'g en banc*, 116 F.4th 211, "that a thirty-day review period" for a shall-issue licensing regime was "per se an unconstitutional temporary deprivation of Second Amendment rights" was "especially difficult to square" with "*Bruen*'s contrasting statements that '*lengthy* wait times . . . [would] deny ordinary citizens their right to public carry.'" *Antonyuk I*, 89 F.4th at 315 n.24 (emphasis and alterations in original) (quoting *Bruen*, 597 U.S. at 39 n.9).[10]

We emphasize, however, that the SCPD's application processing times of up to two to three years likely constitute "lengthy wait times" that effectively "deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38 n.9. Thus, we make clear that the denial of a preliminary injunction with respect to the facial challenge to the processing time, as framed by the Applicants, does not foreclose as-applied challenges to the SCPD's licensing timeline.

---

[10] We had no occasion to reiterate this point in *Antonyuk II* because, by the time we issued that opinion, the Fourth Circuit had already reversed the panel decision *en banc*. *See Maryland Shall Issue, Inc.*, 116 F.4th at 216.

## III. Challenges to the SCPD's Arrest Policy

Finally, we address Plaintiffs' challenge to SCPD's Arrest Policy. The district court declined to preliminarily enjoin the enforcement of the Arrest Policy based principally on its determination that Plaintiffs lack standing to bring a pre-enforcement challenge to that policy. As explained below, we disagree and conclude, based on the record at the preliminary injunction stage, that at least Giambalvo has established standing to challenge the Arrest Policy.[11]

In the context of a pre-enforcement challenge, a plaintiff can establish an imminent injury by plausibly alleging that (1) he "intends to engage in a course of conduct arguably affected with a constitutional interest," (2) that the intended conduct is proscribed by the challenged government regulation, and (3) "there exists a credible threat" of government enforcement. *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015) (alteration adopted) (internal quotation marks and citation omitted).

---

[11] Plaintiffs also argue that the Instructors have "derivative standing to assert the subsidiary right to receive firearms training on behalf of their actual and potential customers." Appellant's Br. at 29. However, because we conclude that Giambalvo has established standing to seek preliminary enjoinment of the Arrest Policy, we need not decide whether the Instructors or other Applicants have the requisite standing. *See Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 70 n.6 (2d Cir. 2019) ("Only one party must have standing to seek each form of relief.").

On the record before us, Giambalvo has shown that he intends to engage in future conduct proscribed by the Arrest Policy. In his declaration in support of the preliminary injunction motion, Giambalvo averred that he was "planning to take the 18-hour concealed carry training course required by the CCIA [at a later date] and provided by [the Instructors]" but faced a "credible threat of arrest and incarceration" under the Arrest Policy because the "SCPD ha[d] not issued [his] handgun license yet."[12] App'x at 96. Because the record reflects that Giambalvo is still unlicensed, this intended future conduct remains subject to the SCPD's Arrest Policy.

Giambalvo has also demonstrated that there exists a credible threat of the SCPD enforcing the Arrest Policy against him. "Whether a threat of enforcement is credible necessarily depends on the particular circumstances at issue, and will not be found where plaintiffs do not claim that they have ever been threatened with [enforcement], that [enforcement] is likely, or even that [enforcement] is remotely possible." *Cerame v. Slack*, 123 F.4th 72, 85 (2d Cir. 2024) (internal

---

[12] To be sure, Giambalvo specifically averred that he intended to take the training course "in December 2022." App'x at 96. However, nothing in the record suggests that Giambalvo actually took that specific course or that he no longer intends to take any such courses in the future.

quotation marks and citation omitted). "[W]e consider, among other factors, the presumption that the government intends to enforce its laws, the recency of the applicable regulation, the general extent of enforcement against similar conduct, and whether there has been any specific disavowal of enforcement against a plaintiff or his conduct." *Id.* While previous enforcement activity is "relevant to assessing the credibility of an enforcement threat . . . such evidence is [not] *necessary* to make out an injury in fact." *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 139 (2d Cir. 2023) (emphasis in original). Ultimately, the credible-threat standard "sets a low threshold and is quite forgiving to plaintiffs seeking [] preenforcement review, as courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Id.* at 138 (internal quotation marks and citation omitted).

Here, Melloni averred that Lieutenant Komorowski—who is the "Commanding Officer of the Pistol Licensing Bureau," App'x at 132, and is "directly responsible for enforcing and implementing the licensing policies and procedures of the SCPD Licensing Bureau," *id.* at 19—informed him that the SCPD will "arrest anybody who handles a pistol or revolver without a New York State pistol permit" and that it is "not honoring" the state-law exception that allows for

gun training before a permit is issued, *id.* at 119.  Those facts, set forth in Melloni's

affidavit,[13] are uncontroverted and must be "taken to be true" for our standing

analysis at the preliminary injunction stage.  *Do No Harm*, 126 F.4th at 119; *see Elrod*

*v. Burns*, 427 U.S. 347, 350 n.1 (1976) (noting that "uncontroverted affidavits" are

to be taken as true).  In our view, the district court did not take these statements to

be true when it discounted them as "stray comments allegedly made by individual

law enforcement officers, which, if made, may well have been taken out of

context."  *Giambalvo*, 656 F. Supp. 3d at 385; *see also id.* at 385 n.6 (stating that "[t]o

the extent that Komorowski made an oral threat that an arrest could be made in

contravention of state law, such an action would be highly inadvisable").

Moreover, the district court did not appear to acknowledge that the "individual

law enforcement officer[]" who made these comments was the lieutenant in charge

of enforcing and implementing the SCPD's licensing policies, which increases the

likelihood that the Arrest Policy is an official SCPD policy that will be enforced.

*Id.* at 385.

---

[13]  Although Melloni's affidavit does not expressly aver that Lieutenant Komorowski is responsible for enforcing and implementing the SCPD's licensing policies, it is a reasonable inference based on his title as the "Commanding Officer of the Pistol Licensing Bureau."  App'x at 132.

Thus, we conclude that, based upon the current record, Giambalvo has plausibly alleged an imminent injury in fact, as required to establish standing at this preliminary stage of the litigation.  We recognize that no Plaintiff has averred that the Arrest Policy has ever been enforced.  However, the Arrest Policy was described to Melloni only shortly before the date that the preliminary injunction motion was filed, the record does not contain any disavowal by Lieutenant Komorowski or the County,[14] and the Instructors' firearms training is "in the precise location that the [Arrest Policy] targets." *Vitagliano*, 71 F.4th at 139.  The sum of these factors persuade us that, on this record at this stage of the litigation, Giambalvo has crossed over the standing line.

We emphasize that this conclusion relies upon the truth of Lieutenant Komorowski's statement to Melloni about the existence of the Arrest Policy.  However, "it will be [Plaintiffs'] obligation to continue to demonstrate standing with the manner and degree of evidence required at the successive stages of the litigation." *Emilee Carpenter*, 107 F. 4th at 99 (internal quotation marks and citation

---

[14] Lieutenant Komorowski's declaration and affidavit below do not refute the existence, or disavow enforcement, of the Arrest Policy.  *See* App'x 132–33, 136–38.  While the County stated in a supplemental letter that the SCPD "is not arresting dwelling pistol license holders for taking the [live-fire] course," App. Ct. Dkt. No. 109 at 1, it did not represent that the SCPD was not arresting *unlicensed* participants.

omitted). In other words, "[our] conclusion would have little bearing on the question of standing if a more developed factual record should cast doubt on whether [Plaintiffs] face[] a credible threat of enforcement" with respect to the alleged Arrest Policy. *Id.* For example, if the record reflects that *no* arrests have been made pursuant to the Arrest Policy between late 2022—when Lieutenant Komorowski described such a policy to Melloni—and the present, that may indicate that enforcement is unlikely. Therefore, the district court may re-assess the standing issue based upon further development of the record on remand.

To the extent the district court denied relief on the alternative ground that Plaintiffs cannot seek a preliminary injunction against the County, we disagree. The district court concluded that the "plaintiffs cannot seek any relief regarding potential prosecution" as against the County because a "district attorney in New York State, acting in a quasi-judicial capacity, represents *the State* not the county." *Giambalvo*, 656 F. Supp. 3d at 385 (emphasis added) (citation omitted). But we understand Plaintiffs to seek preliminary injunctive relief not from prosecution, as the district court appears to believe, but from "arrest and incarceration" pursuant to the Arrest Policy. Dist. Ct. Dkt. No. 27 at 3. On that front, the County defendants are certainly the proper parties from whom to seek injunctive relief.

Accordingly, we vacate the district court's denial of the preliminary injunction as to the Arrest Policy.  Because the record may be further developed on the standing issue, we refrain from reaching the merits on this appeal.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** in part, **VACATE** in part, and **REMAND** for further proceedings consistent with this opinion.